[Crim. No. 7474. In Bank. June 5, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. AARON MITCHELL, Defendant and Appellant.

Milton L. McGhee, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal, pursuant to section 1239, subdivision (b), of the Penal Code, from a judgment, after trial before a jury, finding defendant guilty of murder in the first degree and imposing the death penalty.

*Facts*: The Stadium Club, the scene of the crime, is a bar and restaurant in Sacramento. Defendant appeared at the club at approximately 10:30 p.m. on February 15, 1963. About this time an employee took some meat scraps to a grease barrel at the rear of the premises, and observed defendant looking into the restroom windows. Defendant pointed a sawed-off shotgun at the employee, asking who he was, what he was doing there, and the name of the manager of the club. He was informed that the place was managed by Jack and Eddie Licciardo. Upon inquiry, defendant was informed that a walk-in ice box was on the premises, and he also learned the location of the office safe.

Defendant then ordered the employee to enter the premises, defendant following with the sawed-off shotgun against the employee's back. Upon entering the back door, defendant halted momentarily for the purpose of placing a mask over his face. They then proceeded through the porch area of the premises and into the kitchen, where approximately five employees were working. Defendant ordered them into the walk-in refrigerator. However, the refrigerator was filled, and it was impossible for people to stand in it.

Defendant and the employee went from the kitchen through a hallway to the main bar area, where defendant ordered the employee to lock the front door and directed the customers to move to the middle section along the west wall.

After defendant and the employee left the kitchen, Eddie Licciardo telephoned the police from a kitchen telephone and informed them that a robbery was in progress. His wife served as a lookout during this call, and upon a signal from her he hung up the telephone while giving details of the robbery to a police sergeant.

Defendant returned to the kitchen and ordered the employees to the area where the customers had previously been directed to assemble.

Defendant asked Jack Licciardo if he had made a telephone call, and Mr. Licciardo replied that he had not. Defendant then disconnected the telephone located in the bar area.

As the customers and employees were proceeding to the middle section, defendant fired his shotgun into the ceiling, stating, "That's just to let you know it's loaded. Get moving." After the shot was fired, the customers and employees moved to the designated area with considerable dispatch.

Defendant then ordered Jack Licciardo to open the cash register behind the bar. Defendant obtained a tablecloth and

put it on the bar. The money, consisting of coins and currency, was placed on the tablecloth.

Upon defendant's order, they went to the floor safe in the cloakroom. Defendant was told that no money was in the safe. After defendant inspected the safe and found no money, he and Jack Licciardo returned to the bar area. Defendant picked up the money which had been taken from the cash register and started toward the front door, which had a round window or porthole in it about 15 inches in diameter.

As defendant approached the front door, a customer knocked on the porthole, seeking entrance to the bar. The customer disappeared, and an officer's face, that of Officer Bibica, was then seen through the porthole. At this time defendant was 7 or 8 feet from the door. He exclaimed, "Oh, oh!" and turned around and ran to the kitchen area.

At approximately 10:45 p.m., Officers Bibica and Shaw had received a radio call in their patrol car ordering them to the Stadium Club to investigate an armed robbery then in progress. They were informed that the robber was armed with a knife.

When they arrived, Officer Bibica approached the front door, and Officer Shaw went to the rear of the premises. Officer Shaw entered the kitchen through the porch area. He was armed with a .38 Smith and Wesson revolver, which was in his holster as he entered.

Officers Gamble and Reese, in another patrol car, were also dispatched to the Stadium Club. As they neared the building, they observed a police car parked in front and saw an officer running to the rear. They parked their car at the rear of the building and, as they did so, they observed an officer entering the rear door.

Jack Licciardo testified that he moved from the middle section of the premises somewhat closer to the kitchen after defendant entered the kitchen; that he heard someone say, "Don't pull it! Don't pull it or I'll shoot!"; that these words were followed by a slight pause, and he then heard, "Lay it down. Lay it down."; that another pause followed; and that he then heard a lot of shooting.

Officer Shaw testified that after entering the kitchen, he confronted defendant, who was standing in the hallway 10 or 12 feet away; that defendant was in a semicrouched position with a double-barrel sawed-off shotgun in his hands and a black knit hood covering his head and face; that defendant ordered him to stop and put his hands up, which he did; that

he was then ordered to remove the revolver from his holster, which was worn on the right hip; that he started to remove the revolver with his right hand, but was ordered to use his left hand; that he did as directed, placing the revolver on a shelf in the kitchen; that the revolver was loaded and contained six rounds of ammunition; and that he did not fire it.

Officer Shaw further testified that he remained standing with his hands raised; that he looked over his shoulder and saw what appeared to be a uniformed officer move across the kitchen doorway; that he was then grabbed by the upper right arm and pushed toward the door leading from the kitchen to the porch; that he did not see who grabbed his arm, but he believed it was defendant; and that this person moved in behind him and placed a hard object at his right side at approximately waist level.

Officer Shaw further testified that as he and defendant thus moved from the kitchen doorway to the porch, he was aware of a muzzle flash at his lower right side; that he believed this was a shotgun flash; that he and defendant continued to move through the porch area; that as they approached the rear door, he turned around with his back to the rear door; that the hard object remained against his right side; that as he turned, he saw an officer move from his right to his left near the kitchen door; that at this point he saw a second muzzle flash at his right side; that the officer he had observed was then moving in a crouched position, possibly falling; that at this point he himself was hit by a bullet, which entered his upper left thigh and emerged from the left buttocks*; that the force of the bullet knocked him down, and he fell in the rear doorway with his head and shoulders outside the premises; that someone was under him; that he tried to grab him, but whoever it was kicked loose; that he saw a red shotgun shell and a piece of the forestock of the shotgun lying near his head; that thereafter he heard additional firing outside; that he saw Officer Gamble lying some distance from him; and that he recalled some shots being fired between the first and second muzzle flashes he had observed coming from near his right side.

Officer Reese testified that Officer Gamble entered the rear door into the porch area, and he himself followed a few feet behind; that they heard defendant yelling in the kitchen; that a uniformed officer was observed in the kitchen, and part

---

*Expert testimony established that this bullet came from Officer Gamble's gun.

of defendant's sawed-off shotgun was seen; that Officer Gamble took a position at a corner of the doorway leading into the kitchen with his back against the west wall of the kitchen; that he himself took a position to the west of Officer Gamble; that at this time Officer Gamble had his gun out; that the kitchen screen door was swung open, and Officer Shaw stepped through the doorway; that defendant was close behind to the right of Officer Shaw; that as they came through the door, Officer Gamble turned toward them; that he then heard firing and observed Officer Gamble flinching as though there were sparks coming out at him; that defendant and Officer Shaw continued to move through the porch area to the outer door, and both of them went down near the outer doorway; that at or near this point there was general firing, which he could not specifically attribute to any officer or defendant; that defendant got up and lunged out the door; and that he himself fired one shot at defendant at that time.

After the shooting, defendant ran through the parking lot of the Stadium Club, across a vacant lot, and into a shed about two blocks away, where he was found in a wounded condition. Several shots were fired by the officers at defendant during his flight, and he fell twice. Between the club and the shed, defendant fired a shot from the shotgun, which caused it to explode, apparently due to dirt in the barrel. He discarded Officer Shaw's gun in some grass before reaching the shed. There were six expended shells in this gun.

The record shows that Officer Gamble fell near the kitchen door. His weapon, a .357 Magnum, was nearby. There were four spent shells and two live ones in it.

Officer Gamble was dead upon arrival at the hospital. Death was caused by a bullet wound in the right chest. The bullet fractured the third rib upon entrance, penetrated the lungs and the aorta, fractured the sixth rib posteriorly, and came to rest underneath the skin beneath the sixth rib. The specific cause of death was hemorrhaging due to the laceration of the aorta and lungs. The bullet wound was one-quarter of an inch in diameter and was surrounded by powder burns and smudging. In the opinion of the autopsy surgeon and the criminalist, this was a contact wound, the gun having been fired against the chest of Officer Gamble. Expert testimony established that the bullet which killed Officer Gamble was fired from Officer Shaw's gun, a .38 Smith and Wesson revolver.

Defendant testified that he did not work on February 15,

1963, the day of the killing; that he did some drinking in the afternoon but was not intoxicated; that around 3 o'clock he contemplated committing a robbery; that he purchased some shotgun shells and a hood; that he sawed off the barrel of his shotgun; that he parked his car in the vicinity of the Stadium Club about 9:30 p.m.; that at this time he was dressed in a white shirt and light grey pants; that prior to leaving the car for the club he put on dark pants, a dark shirt, and an overcoat over his regular clothes, his purpose being to escape identification; and that he loaded his shotgun and put extra shells in his pocket, so he could fire the shotgun into the ceiling in order to intimidate the people in the club.

Defendant's testimony as to the actual robbery is substantially similar to the facts summarized above. He recounted meeting Officer Shaw in the kitchen, ordering him to disarm, and obtaining the officer's revolver. According to defendant, after he disarmed Officer Shaw he ordered him to turn around and walk to the kitchen door, defendant following him with the sawed-off shotgun in his right hand and the officer's revolver and the money taken from the cash register in his left hand.

Defendant testified further, however, that as he and Officer Shaw walked through the kitchen doorway to the porch area, he observed Officer Reese about 20 feet away, and thereupon stated, "You got me," meaning he wanted to surrender; that at this point it appeared someone said, "Get him"; that the firing of guns commenced; and that he did not remember any of the events thereafter, such as his firing Officer Shaw's gun or the shotgun, being wounded by Officer Gamble, or entering the shed where he was apprehended.

*Questions*: First. *Is the evidence sufficient to support a finding of first degree murder?*

■ *Yes.* Under the felony murder rule, contained in section 189 of the Penal Code, a killing committed in the perpetration of, or attempt to perpetrate, a robbery is murder in the first degree. ■ Such a killing committed during the course of a robbery is murder in the first degree whether the killing is wilful, deliberate, and premeditated, or merely accidental, and whether or not the killing is planned as part of the commission of the robbery. (*People* v. *Jones,* 52 Cal.2d 636, 651 [11] [343 P.2d 577]; *People* v. *Cheary,* 48 Cal.2d 301, 313 [13] [309 P.2d 431]; *People* v. *Rupp,* 41 Cal.2d 371, 380 [8, 9] [260 P.2d 1].)

■ Defendant pleaded guilty to the charge of robbery

but contends that since the killing occurred after his alleged attempt to surrender, the robbery was not in progress at the time of the killing, and that the evidence is therefore insufficient to support a finding of first degree murder under the felony murder doctrine.

This contention is without merit. Defendant testified with respect to his alleged attempt to surrender: "Well, immediately when the screen door opened, I seen this officer down in back there with his gun out. He has got it pointed right at both of us [defendant and Officer Shaw]. So then I just say, 'You got me,' just like that. And at this particular time, all the shooting started."

Defendant further testified: "Q. ... You stated that you came to the door, you observed the other officer, and you said you raised your hands like this (demonstrating), and said, 'You got me!' Did you hear any statements or any words or any exclamations or anything else like that? ... A. Well, I can't be sure, see, because—well, I just don't know, but it appeared to me that the—at my words, 'You have got me,' it appeared someone said, 'Get him!' I could be mistaken about that. I do not know."

On cross-examination defendant testified: "Q. And what did you do, when you said, 'You got me'? A. Well, I just raised up both hands, up so high, and just stood there (demonstrating). Q. You raised up both your hands and you just stood there—that means in your left hand you are standing with a gun and a wad of money—is that right? A. Yes, sir. Q. In the other hand, you are standing with your shotgun in the air? A. Well, it happens some faster than that, you see. You don't get a chance to come to a stationary, at this point, see? Q. Well, you just tell me how far you raised your hands when you said, 'You got me.' A. Well, I just—when I saw the officers, just automatic reflex. I say, 'You got me. Q. This is the third officer you've seen, is that right? A. Yes, sir. Q. And all of a sudden you've decided somebody's got you, is that your testimony? A. Well, he's got a gun on me, right there. Q. All right. Now then, what happened? A. Well then, all the shooting started."

Even if defendant's version of what occurred is accepted as true, as a matter of law such alleged attempt to surrender was not a sufficient intervening act to terminate the robbery.

■ Proof of a strict causal relationship between a felony and a homicide has never been required in this state (*People v. Ketchel*, 59 Cal.2d 503, 524 [12] [30 Cal.Rptr. 538, 381

P.2d 394]), and it is sufficient to show that the felony and the homicide were parts of a continuous transaction.

In *People* v. *Chavez*, 37 Cal.2d 656, 669 [234 P.2d 632], we said: "In his argument, Chavez erroneously assumes that to bring a homicide within the terms of section 189 of the Penal Code, the killing must have occurred 'while committing,' 'while engaged in,' or 'in pursuance' of the named felonies, and that the killing must have been 'a part of' the felony or attempted felony 'in an actual and material sense, and have resulted as a natural and probable consequence thereof.' The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the felony before the homicide was completed.

"In *People* v. *Boss*, 210 Cal. 245, 252, 253 [290 P. 881], this court said that the felony murder rule '... was adopted to make punishment of this class of crime more certain. It was not intended to relieve the wrongdoer from any probable consequences of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural.' The homicide is committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction."

In the present case, defendant's conduct set in motion a chain of events among the reasonably foreseeable consequences of which was a killing such as actually occurred. His acts of robbery created the explosive and dangerous situation which existed at the moment he and the officer hostage attempted to pass through the kitchen door, i.e., officers with guns drawn determined to carry out their highest responsibility even at the risk of their own lives. Even assuming that the officers as reasonable and prudent persons should have been aware of the alleged surrender, it was reasonably foreseeable that during the sudden terror created by defendant's behavior the officers might act imprudently. (Cf. *People* v. *Harrison*, 176 Cal.App.2d 330, 335-336, 345 [1, 2] [1 Cal. Rptr. 414] [hearing denied by the Supreme Court].)

Under the facts of this case, it is clear that defendant's alleged surrender did not terminate the robbery and that Officer Gamble's death occurred as a consequence of the robbery. Accordingly, the robbery and the homicide were parts

of a continuous transaction, and the homicide therefore constituted first degree murder.

Second. *Did the trial court err in failing to instruct the jury on second degree murder?*

■ *No.* The only evidence upon which defendant suggests the alternative issue of second degree murder should have been presented to the jury is his testimony of alleged surrender. As a matter of law, however, defendant's alleged surrender does not take the case out of the application of the felony murder doctrine. Thus, there is no evidence upon which to base an instruction on second degree murder, and the trial court properly refused defendant's proposed instructions thereon.

*People* v. *Jeter*, 60 Cal.2d 671 [36 Cal.Rptr. 323, 388 P.2d 355], is distinguishable from the facts in the present case. In such case the trial court instructed the jury on the felony murder doctrine and on self-defense but refused to give instructions requested by the defendants on second degree murder and manslaughter. We there held that instructions on second degree murder and manslaughter were warranted based upon the testimony of the defendants denying the robbery and their testimony that there were arguments concerning a dice game with the victim prior to the altercation resulting in the victim's death. In the present case, however, as pointed out above, there was no evidence upon which a second degree murder instruction could be based.

Third. *Did the trial court err in permitting the district attorney to exercise a peremptory challenge after he had stated he was satisfied with the jury?*

■ *No.* The district attorney, after questioning juror Uffer, passed him for cause. This juror was then questioned by defense counsel and apparently passed, although counsel did not specifically so state. At this point it was the People's turn for the exercise of a peremptory challenge. The district attorney stated, ''The People are satisfied, your Honor.'' A recess was then taken prior to the defense's turn for the exercise of a peremptory challenge.

After the recess the following occurred: ''THE COURT: Now, where do we stand now? THE CLERK: It's the People's challenge, I believe, isn't it? MR. PRICE [district attorney]: Is it? THE CLERK: Yes, it's yours. MR. PRICE: We'll excuse Mr. Uffer. THE COURT: You are excused, sir, and you will be notified when next to report. MR. SALAMY [assistant public defender]: May I address the Court on that last challenge,

please. Was it a defense challenge or the People's challenge? I withdraw my objection. I believe it's the People's challenge. MR. PRICE: Well— THE COURT: Is there any question about it? MR. SALAMY: No, your Honor. MR. PRICE: No question, because I believe I did before, right before the recess, pass. MR. SALAMY: Didn't he pass? MR. COLE [public defender] : I thought he passed. MR. PRICE: I believe I did. THE COURT: Then— MR. PRICE: I'll move to set aside my passing if that is the correct procedure, and exercise the challenge. THE COURT: You may do so. MR. PRICE: Thank you. THE COURT: And you want to exercise the challenge on Mr. Uffer? MR. PRICE: Yes, sir.''

Counsel on appeal points out that defense counsel had not exercised all the allotted peremptory challenges at this time and that the next juror in the box was peremptorily challenged by the defense.

Defendant has failed to show that the exercise of a peremptory challenge by the People after passing the juror resulted in any prejudice to defendant's substantial rights. (Pen. Code, § 1088.)

On this issue the court in *People* v. *Saugstad*, 203 Cal.App. 2d 536 [hearing denied by the Supreme Court], stated at page 547 [21 Cal.Rptr. 740] : ''Appellants also complain the court committed prejudicial error because it permitted the district attorney to challenge a juror after he had announced that he was satisfied with the jury. There is no merit in this contention. The defense requested a recess after the district attorney announced he was satisfied with the jury and then in the absence of the jury a discussion was had on the question of a change of venue. During this discussion the defense indicated the prospective jury was acceptable. After the jury was recalled the district attorney asked permission of the court to reopen his challenge. The defense objected. After a discussion the court granted the district attorney's request. In the absence of a showing of prejudice to appellants' substantial rights a departure from the procedure prescribed by section 1088 of the Penal Code may not be availed of on appeal.''

Since no showing is made that the procedure followed prejudiced the rights of defendant, he may not raise the issue here.

Fourth. *Was the* voir dire *examination of prospective jurors properly conducted?*

*Yes.*

 Defendant contends:

(i) That a prospective juror was improperly excused for cause because of his views upon the death penalty, such excuse not being compelled by subdivison 8 of section 1074 of the Penal Code.

Prospective juror Jukes was asked the following questions: "Q. Do you entertain any such conscientious opinion or conscientious scruples that would preclude you from returning a verdict. of guilty in a case where the penalty would be death? A. I would like to say that I feel that I might be prejudiced in that respect, yes, sir. Q. That is, you feel that you may have a conscientious opinion with regard to the death penalty? A. Yes, sir. Q. Is that such that it would preclude you from returning a verdict of guilty in a case where the penalty would be death? A. Well, sir, I'm afraid it might. Q. In other words, if you were convinced that the defendant was guilty of the crime, and you knew that if you returned a verdict of guilty, that that verdict would carry with it the death penalty, do you feel that your conscience is such in regard to the death penalty, that you could not return a verdict? A. Well, I feel, sir, I feel that a man in that case should be put away for life without any possibility for parole. That would be my verdict. I would have to make that statement.''

Section 1074 of the Penal Code provides, in part, that a challenge for implied bias may be taken "If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror.'' (Subd. 8.)

It has been held in numerous cases that where the death penalty may be imposed a prosecutor has the right to ascertain the views of prospective jurors on capital punishment, so that he can intelligently exercise his challenges against jurors whose consciences would preclude them from imposing the death penalty, and it is proper for the court to excuse jurors conscientiously opposed to capital punishment. (*People* v. *Spencer*, 60 Cal.2d 64, 74 [1] et seq. [31 Cal. Rptr. 782, 383 P.2d 134] ; *People* v. *Ketchel, supra,* 59 Cal.2d 503, 528 [22] et seq.; *People* v. *Pike,* 58 Cal.2d 70, 85 [6] et seq. [22 Cal.Rptr. 664, 372 P.2d 656].)

The questions asked prospective juror Jukes came within the language of subdivision 8 of section 1074. He answered in the affirmative when asked if his conscientious opinion on the death penalty would preclude him from returning a verdict of *guilty* in the case.

■ (ii) That it was error to refuse to allow *voir dire* direct examination as to degrees of culpability.

Defendant argues that the following questions to a prospective juror should have been allowed upon the theory that they properly explored varying degrees of culpability: "Q. Now, Mr. French, it's possible that a variety of factual situations could result in the jury finding a man guilty of first degree murder. By that I mean you might have a situation where a man accepts a thousand dollars and for hire goes out and kills a man. On the other hand, you might find a situation where under the law of the State of California, if a killing occurred during the course of a robbery as here, that the killing perhaps was unintentional or accidental. So, on the one hand you have an accidental or unintentional killing. On the other hand you have a killing done for money, without [*sic*] absolute intent to kill the person. Do you agree that those are two varying—that there are two varying degrees of culpability in that situation? MR. PRICE: The law of the State of California makes them both murder in the first degree. . . . THE COURT: Aren't you arguing your case right now? That isn't before this jury. MR. SALAMY: Your Honor, the law is— THE COURT: Sustain the objection. MR. SALAMY: All right. May I reframe the question, your Honor? THE COURT: Yes. MR. SALAMY: Q. Mr. French, I believe his Honor is going to instruct you at the conclusion of this case that a killing done during the course of a robbery is first degree murder, and that is true irrespective of whether the murder or the killing was done intentionally or done unintentionally and accidentally. Now, when you get to the second phase of the trial, if you do so, you will be trying to decide which penalty to impose, and the degree of culpability of this crime or how serious it is, is going to help you decide whether to impose the death penalty or the life sentence. Now, do you agree then that a killing done intentionally, designed to kill a person, should be treated more strongly or more severely than a killing that is accidentally done or unintentionally done? MR. PRICE: I will renew my objection. THE COURT: Sustain the objection."

The trial court correctly held that the above questions actually amounted to argument by defense counsel. Manifestly such argument should not be presented on *voir dire* examination.

It would appear that defense counsel was attempting to ascertain whether the juror would immutably vote for the

death penalty in the event of conviction of first degree murder, a legitimate inquiry for defense counsel to make. (*People* v. *Hughes,* 57 Cal.2d 89, 94 [1] [17 Cal.Rptr. 617, 367 P.2d 33].)

As to this area of inquiry, however, defense counsel was not limited, as indicated by the following: "Q. Mr. French, during the course of the examination of the jurors so far today, we have been discussing a second trial and the question of penalty. And it occurs to me during the noon hour, that we may have been suggesting to you that we are not concerned about the first trial. We are concerned about both the question of guilt and the question of penalty. You appreciate that? A. Yes. Q. And it's only by inquiring as to both —this is the only opportunity we will have to question you. Therefore, we have to cover both matters at this time. Mr. French, you told us just before the lunch hour that you were well aware that in the second trial it's strictly up to the jury to determine the question of life or death, and that there is no presumption one way or the other when you start your deliberations. Now, you are also aware now that first degree murder cases are subject to either life or death penalty, isn't that true? A. That's right. Q. As you sit there now, Mr. French, do you have a personal belief that all first degree murder cases should suffer the death penalty as opposed to life imprisonment? A. Can I answer that in my own words? Q. I believe you can, yes, sir. A. It depends on the circumstances. Q. Right. Then, when you get to the second trial, and you are hearing the evidence as to mitigation or aggravation, as well as during the main trial, will you listen to evidence presented by both sides as to whether or not this killing was done *intentionally* or *unintentionally*? A. Yes, sir. Q. You will consider that in your deliberations, will you not? . . . A. Yes." (Italics added.)

The challenged questions were properly disallowed, in that they were in the form of argument and there was not improper limitation as to defense counsel's inquiry on matters pertaining to the juror's views on the death penalty.

Fifth. *Did the trial judge commit prejudicial misconduct in the trial of the case?*

█ *No.* During the taking of testimony the trial judge received a telephone call. As he left the bench, the following statement was made by him: "THE COURT: (Interposing.) Mr. Price, I have a long-distance call from the Sheriff's Office in San Francisco regarding the prisoner here."

There is nothing in this statement that would even remotely suggest misconduct. The ordinary definition of the word "prisoner" includes a person in custody. It was obvious to the jury that defendant was in custody during the trial. There is no connotation in the word "prisoner" that would in any way tend to degrade defendant under the circumstances, and there was no statement by the trial judge as to the contents of the telephone call.

There was no objection to the statement, and it must be assumed that trial counsel would have registered one if at the time of trial the remark had appeared to be, in any way, detrimental to the interests of defendant.

Sixth. *Did the district attorney commit prejudicial error in his argument to the jury?*

 *No.* The district attorney stated in his argument: "Up to this time going out the door, he's never made any effort to surrender. I submit to you the physical facts, and the eye-witness testimony—how little it is and how fragmentary—doesn't show any desire to surrender, although I will concede that he is badly injured. The final act of defiance is turning around at this spot right here (indicating), and firing. It is a pretty good indication of how he felt, wounded as he was. Is this surrender? Now, there's never been any evidence in this case before the defendant took that stand that he ever tried to surrender; and had he ever said in the hospital, or any other place—"

The following then occurred: "MR. COLE: (Interposing) Just a moment, Counsel. MR. PRICE: I have the right to comment on this evidence. MR. SALAMY: If he is about to comment on the admissibility of self-serving declarations, that wouldn't have been admissible, your Honor, and he knows it. MR. PRICE: I am not commenting on the self-serving declarations at all. MR. COLE: If he is going into new material, we have a right to come back and make further comment. THE COURT: Where is the new material? MR. COLE: Going into something not in evidence. THE COURT: Well, suppose it's not in evidence— MR. COLE: Just a moment, Counsel; he is assuming something not in evidence. THE COURT: Assuming what? MR. COLE: Starting to argue something not in evidence. THE COURT: I don't know what he's going to argue. MR. COLE: I think I have a good idea. THE COURT: He said there was no statement that, at the hospital that he tried to surrender. MR. SALAMY: There is no evidence—and if there was, it wouldn't be admissible. He is implying that there wasn't. A self-serving

declaration is not admissible. THE COURT: Didn't this defendant testify in this court that his intention was to surrender? MR. SALAMY: Mr. Price never showed by any other evidence that he didn't say that originally. Now, he is suggesting that he didn't say it originally, which is absolutely not within the evidence. THE COURT: I see no objection. MR. PRICE: The statement is simply this, ladies and gentlemen— that the officers who accompanied this man to the hospital— no officers were ever asked whether or not he stated he had tried to surrender to any of the officers— MR. SALAMY: (Interposing) I'd like to address the Court out of the presence of the jury on this point. THE COURT: We will excuse the jury.''

After the jury was excused, the following took place: ''MR. SALAMY: Mr. Price has provided the defense counsel prior to some of the testimony in this case with a statement presumably made by the defendant to a Mr. Paul Hietala, also one presumably made to Mr. Hugh Millar, who testified in this case. Neither of those two people testified to any declarations made by the defendant at the time he was at the hospital, and at the time when they were on cross-examination, within the scope of cross-examination, we would not have the right to put on these declarations because they would be self-serving—strictly inadmissible to permit Counsel to comment on the failure of the defense to put on evidence which we have no legal way of putting on. It's ridiculous, your Honor. He should not be permitted to do that, and the jury should be admonished to disregard any inference that there was ever a statement or lack of a statement made by the defendant to the effect that he did try to escape or didn't. THE COURT: Were there any statements made in the— MR. SALAMY: There are statements made which we have in reports, your Honor, and the statements are not in evidence, and I am not suggesting whether they do or don't refer to the giving up, or surrender. But they aren't in evidence. THE COURT: Is there any testimony here any place of any oral statement made by the defendant? MR. PRICE: Yes, there is. MR. SALAMY: Not of the two in which he gave a further explanation of what happened. The only ones that are in evidence are simply this: 'How are the officers that I shot?' He said that in a semi-conscious manner to Officer French, or rather Bibica. The complete statement that he made to Mr. Hietala, which he made to Mr. Hugh Millar— who took the stand and didn't testify to it, because it was beyond the scope of the direct examination—are not in evi-

dence. And what was said to those two people relative to what he, the defendant, did that night, is absolutely not admissible, and at this time if there is some lack in those two statements as to his reference to surrender, or even if he said he did surrender in those two statements, it isn't admissible now. And any implication either way is absolutely unfair to the defendant. THE COURT: However, I think Mr. Cole brought out for the defendant that his intention was to surrender. MR. SALAMY: And Mr. Price didn't impeach him, that he made statements previously that were not consistent with that, and to permit him, without impeaching on that ground, to infer that he didn't—the first time that he ever mentioned it in this trial—is unfair. THE COURT: I will sustain your objection. MR. SALAMY: Will your Honor admonish the jury to disregard it? MR. PRICE: I have no objection to admonishing the jury. I won't proceed with it. THE COURT: All right. Call them in.''

After the jurors returned to the courtroom, the following occurred: ''THE COURT: Now, Ladies and Gentlemen of the jury, you are admonished that you are to disregard any statement by Mr. Price, the District Attorney, with regard to any statement that was not made, or he refers to his failure to make any statement in the hospital or at any other time— you will disregard that statement. Go ahead. MR. PRICE: Thank you, your Honor. I apologize to the jury and to Counsel, and to the Court for getting carried away on that particular note.''

The court's full and complete admonition to the jury cured any possible error arising from the prosecutor's remarks. ▮ It is the general rule that remarks not made in bad faith as to matters not based upon the evidence do not constitute prejudicial error where the court admonishes the jury to disregard them. (*People* v. *Combes*, 56 Cal.2d 135, 149 [14 Cal.Rptr. 4, 363 P.2d 4]; *People* v. *Saugstad, supra,* 203 Cal.App.2d 536, 546 [2, 3].)

▮ In the present case, the remarks were not made in bad faith. They were not inflammatory, but, on the contrary, were innocuous when considered in the context of the entire cause. It is evident that such remarks did not substantially contribute to the verdict.

Seventh. *Did the trial court err in refusing to correct and augment the record?*

▮ *No.* Defendant *in propria persona* filed an applica-

tion for an order to correct and augment the reporter's transcript on appeal.

The trial court held a hearing on this petition and separately considered each of defendant's requests for correction and augmentation.

Minor clerical corrections were allowed, and the augmentations were denied.

The court reporters taking the proceedings during the trial were present during the hearing on the application to correct and augment the record.

The trial judge requested that the reporters check their notes as to each requested correction and augmentation, and the rulings of the trial court were in accordance with the matters shown by the court reporters' notes.

Defendant testified that he had not taken any notes during the course of the trial and that the claimed errors in the record were based upon his memory as to what had transpired.

■ The settlement of a transcript as to corrections and augmentations is primarily a question of fact to be resolved by the trial court. (*People* v. *Chessman,* 52 Cal.2d 467, 478 et seq. [341 P.2d 679].)

■ A reading of the transcript of the proceedings had on defendant's application for correction and augmentation clearly demonstrates that the trial court correctly decided the matters of correction and augmentation, and no abuse of discretion appears.

■ Eighth. *Did the trial court err in the penalty phase of the case in instructing the jury:* "*In making your determination as to the penalty to be imposed, you may, in exercising your discretion to choose between different punishments, consider as a possible consequence that the law of this state provides that a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor on recommendation of a majority of the* Justices of the Supreme Court, and that a prisoner serving a life sentence may be eligible for parole"*?*

*Yes.* (See *People* v. *Morse,* 60 Cal.2d 631, 636 [1a] et seq. [36 Cal.Rptr. 201, 388 P.2d 33] ; see also *People* v. *Hines, ante,* pp. 164, 175 et seq. [37 Cal.Rptr. 622, 390 P.2d 398].)

The judgment is reversed insofar as it relates to the death penalty, and the case is remanded to the trial court for a

retrial on this phase. In all other respects the judgment is affirmed.

Gibson, C. J., Traynor, J., Peters, J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J.—Concurring and Dissenting.—In my view, the record at bench shows procedural error of the type, but not the salience, defined and denounced in *People* v. *Morse* (1964) 60 Cal.2d 631, 649-653 [6a] [36 Cal.Rptr. 201, 388 P.2d 33] and in *People* v. *Linden* (1959) 52 Cal.2d 1, 27 [26b, 32] [338 P.2d 397]; see also *id.* at p. 28 [33]. More specifically, the error here is not shown to be aggravated by circumstances of the character or significance delineated in the *Morse* decision.

In *Morse*, it was only by appraising the significance and projecting the probable effect of those circumstances in relation to the otherwise presumably harmless factual matters of common knowledge recounted to the jury by way of instruction, that we found cause for reversal. We carefully defined that cause and our decision within the constitutional ambit (p. 653 [6a] of 60 Cal.2d) as follows: "after examination of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant as to penalty would have been reached in the absence of the error." (See Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [12] [299 P.2d 243].) The majority also cite *People* v. *Hines,* (1964) *ante,* p. 164 [37 Cal.Rptr. 622, 390 P.2d 398] but it is not contended that *Hines* has reversed or disapproved either *Morse* or *Watson.*

Applying the above quoted rule here, after examination of the entire cause, including the evidence, I am *not* of the opinion that it is reasonably probable that a result more favorable to the defendant as to penalty would have been reached in the absence of the error.

Accordingly, I would affirm the judgment in its entirety. (See also my dissents to *People* v. *Hines* (1964) *ante,* pp. 164, 175-182 [37 Cal.Rptr. 622, 390 P.2d 398]; *People* v. *Terry* (1964) *ante,* pp. 137, 154 [37 Cal.Rptr. 605, 390 P.2d 381]; *People* v. *Arguello* (1964) *ante,* pp. 210, 215 [37 Cal.Rptr. 601, 390 P.2d 377]; *People* v. *Polk* (1964) *ante,* pp. 217, 235 [37 Cal.Rptr. 753, 390 P.2d 641]; *People* v. *Kroeger* (1964) *ante,* pp. 236, 248 [37 Cal.Rptr. 593, 390 P.2d 369].)