[Crim. No. 26218. Second Dist., Div. Three. Sept. 24, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
EARL LEE MOORE, Defendant and Appellant.

**COUNSEL**

Roger S. Hanson for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Cynthia Sonns Waldman and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FORD, P. J.**—After his motion for suppression of evidence (Pen. Code, § 1538.5) had been denied, defendant withdrew his plea of not guilty of the crime of grand theft (count I) and, pursuant to a conditional plea agreement, pleaded nolo contendere as to that charge. Count II was dismissed pursuant to the agreement. The proceedings were suspended without imposition of sentence and defendant was placed on probation for 3 years on certain terms and conditions, which included the payment of a fine, the spending of 30 days in the county jail, and the

making of restitution. He has appealed from the judgment (order granting probation), contending that the trial court erred in denying his motion to suppress evidence made pursuant to Penal Code section 1538.5.[1]

On this appeal defendant contends that there was no probable cause for his arrest and that the officers unlawfully seized his vehicle located on his private property and thereafter illegally searched it.

At the hearing in the superior court of the motion to suppress evidence it was stipulated that the testimony of the witnesses at the preliminary hearing as recorded in the reporter's transcript could be introduced. That transcript was received in evidence. In addition, oral testimony was received at the hearing of the motion.

Mrs. Buck testified that on April 29, 1974, at about 1:10 p.m. she received a telephone call from a person with a male voice who stated, "This is Mr. Wilson from the bank." He told her that someone was using some of her money and that three tellers were under suspicion. He asked her to come to the bank and withdraw $1,245 so that they could check and find out what other account was being used by the person who was under suspicion. He further said that "Mr. Young" might want to talk to her for a minute and that she should not leave the bank parking lot too soon. The caller obtained from her a description of her car and of the clothes she was wearing.

Mrs. Buck went to the bank in Santa Maria and at approximately 2:20 p.m. withdrew $1,245 from her savings account, receiving a $100 bill, two $20 bills, a $5 bill, and the remaining amount in $50 bills. She returned to her car in the parking lot and waited. Just as she was starting to leave, a man came up to her, saying, "Mrs. Buck?" She answered affirmatively. The man said that he was Mr. Young and showed her a detective badge and identification. He told her, "They want me to take the money back in the bank for identification." She handed him the envelope containing the money. He walked around the rear of the car and Mrs. Buck started to leave. Her friend, Miss Doyle, said, "You never got a receipt." Mrs. Buck stopped her car and ran to the rear door of the bank. Just as she

---

[1]"A proceeding under section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]" (*People v. Superior Court (Keithley)*, 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

was entering the bank, Mr. Young came out of the door. She called to him and said that she wanted to speak to him for a moment. He responded, "I have an appointment and I'm a little bit late." Mrs. Buck walked up to him, took him by the arm and said, "I want to speak to you in the bank." He pulled away from her and ran down the alley. She ran after him but she lost sight of him after he left the alley. Mrs. Buck further testified that she was "pretty sure" defendant was the man, "Mr. Young."

After the man disappeared, Mrs. Buck asked a woman, "Did you see a man with a brown suit running up the street?" The woman told her that the man ran around the corner on Church Street, handed a "check" to some man in a car, and then kept on running. The woman said that she had obtained the license number and knew what make of car it was. The license number was later given to the police.

Miss Olivera, a teller, testified that on the same day, prior to the commotion in the bank because of Mrs. Buck's incident, she furnished a roll of dimes to defendant. She had dealt with rolls of dimes which bore the name of Leisure Way Laundry with a Santa Maria address; the laundry was a customer of the bank.

Detective Diaz of the Santa Maria Police Department testified that he was the officer who received the original call, just after the incident at the bank, and he was the first officer to arrive there. When he contacted Mrs. Buck at the bank she gave him information as to a license number, part of his testimony being as follows: "She told me at first about being defrauded out of the money, and she said that she had a piece of paper with a license number written by the woman that had seen a car where the man ran up to the car." Mrs. Buck gave him the piece of paper. He later found out that the woman was Nancy Sorenson. Detective Diaz immediately called the police department and notified the dispatcher to have Detective McGregor see if he could follow up on the license number. The license number was 477 JJZ.

Detective McGregor of the Santa Maria Police Department testified that on April 29, 1974, he was advised that there was some kind of a bank examiner fraud at the bank. He reviewed the circumstances of the alleged offense with other officers and witnesses. In the course of his investigation he determined that a public offense had occurred. That conclusion was based upon information he had received from Detective Diaz of the Santa Maria Police Department that "a male subject" had

telephoned Mrs. Buck and had encouraged her to withdraw money from her savings account at the bank, informing her that there had been some discrepancies at the bank and that the purpose was to discover the identity of the person responsible for the discrepancies; that Mrs. Buck withdrew the money as requested; that she was thereafter approached by a man who identified himself by means of a badge and she gave him the money; that Mrs. Buck then had "second thoughts" about the incident and went after the man, whereupon he fled; that at about that time and near the location, the man was observed as he ran up to a gunmetal-gray station wagon, described as a Datsun or Toyota, and handed an envelope or a check to the driver, which the driver put in his pocket, whereupon the driver, accompanied by another man, drove away and the "running subject" fled from the area on foot.

In the course of the "description" Detective McGregor was given license number 477 JJZ which, he learned, was obtained from Mrs. Sorenson, who had personally observed the incident of the man running up to the car and delivering the check or money to the occupant. Detective McGregor checked the license number with the Department of Motor Vehicles and was informed that it related to a 1973 Mazda station wagon registered to Martin Childers. He then contacted the legal owner, a finance company in San Bernardino, and was advised that the vehicle had been financed for Mr. Childers, who worked at "Fairview Ford." Using the telephone number given to him by the finance company, Detective McGregor telephoned Mr. Childers at his place of employment. Mr. Childers told him that he had financed the vehicle for a good friend named Earl Moore (defendant) and that Mr. Moore, who lived in Camarillo, was the actual owner of the car. Mr. Childers gave Mr. Moore's telephone number to the officer. He also told the officer that Mr. Moore was a white male approximately 35 years old, 5 feet 8 inches to 10 inches in height, 190 pounds in weight; he further described him as being stocky and as having light brown hair.

Detective McGregor had been informed that Mrs. Buck had described the culprit as being a white male adult approximately 40 years of age, 5 feet 10 inches to 5 feet 11 inches in height, 180 pounds in weight, with "a round face wearing glasses" and "dark brown medium hair."

Detective McGregor further testified that the offense at the bank occurred at 2:32 p.m. and that he talked to Mr. Childers at approximately 3:25 p.m. He reasoned that Mr. Childers "couldn't have made it from Santa Maria to San Bernardino within that period of time." He did not

then know anything about Mr. Childers' reputation for honesty except "to the extent he has been on the same job for nine years . . . , had an excellent credit rating with the finance company."

Detective McGregor testified that after his conversation with Mr. Childers, he communicated with Sergeant Markley of the Sheriff's Department of Ventura County, portions of his testimony being as follows: "Q. And what was the time that you sent that information to the Ventura S.O.? Sheriff's office? A. On April the 29th at 1545 hours which would be 3:45 p.m. . . . THE WITNESS: . . . I advised Sergeant Markley that a bank examiner fraud bunco had occurred within the City of Santa Maria, that a license number of a suspect vehicle had been obtained, that investigation—BY MR. ANDRADE [deputy district attorney]: Q. What was the license number? A. Four seven seven John John zebra. . . . A. It was a Mazda station wagon. I'm guessing now without referring, a 1973 Mazda station wagon, silver-grey in color. . . . Q. Did you describe to Sergeant Markley on the phone the nature of the crime or alleged crime in Santa Maria? A. Yes, sir, I did. Q. And at that time that you described it to him, had you been sufficiently advised by witnesses to feel that you had probable cause for an arrest? A. Yes, sir, I did. . . . A. . . . I also advised him [Sergeant Markley] to impound Mr. Moore's vehicle for investigation as having been used in the commission of a felony."

Detective Campbell of the Ventura County Sheriff's Department testified that on April 29, 1975, at approximately 5:30 p.m. he placed defendant under arrest at 578 Leonard Street in Camarillo, informing him that the arrest was for grand theft. He saw a Mazda station wagon bearing license number 477 JJZ in the driveway; he had received a dispatch about that car. The officer started back to Ventura with defendant and was requested over the air to seal and impound the vehicle. The officer returned to defendant's premises to seal the vehicle.

Detective Campbell testified that the driving time from Santa Maria to Ventura was an hour and 45 minutes.

Detective McGregor further testified that after he learned that defendant Moore had been arrested he went to the Ventura area and examined the 1973 Mazda at an impound yard in Camarillo. Sergeant Meek of the Ventura Sheriff's Department was present. All four doors and the rear lid of the vehicle had been sealed. The seals were broken for the purpose of making the examination. As to what the search disclosed, Detective McGregor testified: "I located a roll of dimes in the glove

compartment of the vehicle. It was a $5 roll, and it had 'Leisureway Laundry, 1634 North Broadway, Santa Maria,' stamped on it. On the right front floorboard of the vehicle, I located a McDonald's paper napkin which had various ink writing on it. The rear deck of the station wagon I located a metallic silver black card which said, 'Official Government Vehicle' on it. It had an Air Force insignia on it."

As stated in *People* v. *Braun,* 29 Cal.App.3d 949, at pages 966-967 [106 Cal.Rptr. 56]: "It is well established that a police officer may lawfully arrest a person without a warrant if the arresting officer has reasonable cause to believe that the person arrested has committed a felony. Reasonable or probable cause has been defined as such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime [citation]. The cases emphasize that the rule of probable cause is a practical, nontechnical conception. In determining whether there is probable cause, each case must necessarily be decided upon its own facts and circumstances or, as sometimes said, ' "on the total atmosphere of the case" ' [citation]." Moreover, as stated in *People* v. *Ingle,* 53 Cal.2d 407, at page 413 [2 Cal.Rptr. 14, 348 P.2d 577]: "Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt."

In the present case Detective McGregor had obtained reliable information as to the physical description of the culprit and as to the vehicle used in the perpetration of the crime. His inquiry as to the ownership of the vehicle caused him to telphone Mr. Childers. There was no reason for the officer to assume that Mr. Childers was involved in the crime since his telephone conversation with Mr. Childers occurred less than an hour after the crime and Mr. Childers was a long distance away from Santa Maria. Moreover, Mr. Childers was not acting as an informant relating to an officer what he knew of criminal activity of defendant. Rather, he was in the position of a citizen responding to inquiries of an officer as to a vehicle which appeared to belong to him and, after informing the officer that defendant Moore had the vehicle, answering questions with respect to defendant's physical appearance and place of residence. Detective McGregor was entitled to take into consideration as an indication of reliability the apparent internal trustworthiness of the statements made by Mr. Childers. (See *Ming* v. *Superior Court,* 13 Cal.App.3d 206, 213 [91 Cal.Rptr. 477].) To character-

ize Mr. Childers as an untested informant upon whom reliance could not be placed is to distort the circumstances under which his information was furnished.

It thus appears that Detective McGregor had reliable information that defendant was the person exercising the rights of an owner with respect to the vehicle used as an instrumentality of the crime and that defendant substantially matched the description of the culprit given by the victim. Such a state of facts was sufficient to reasonably lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that defendant was guilty of a crime. That there was room for doubt was not sufficient to preclude the existence of probable cause.

It is manifest from the record as set out hereinabove that Detective McGregor sufficiently made known to the Ventura County Sheriff's Department the existence of probable cause to arrest defendant. As stated in *People* v. *Braun, supra,* 29 Cal.App.3d 949, at page 967: "It is also recognized beyond dispute that reliable information furnishing probable cause for an arrest does not lose its reliability when it is transmitted through official channels to arresting officers and the latter merely rely upon it when making an arrest. (*People* v. *Hogan* (1969) 71 Cal.2d 888, 891 [80 Cal.Rptr. 28, 457 P.2d 868])." Consequently, the arrest of defendant by Ventura County Deputy Sheriff Campbell was valid. (See *People* v. *Lara,* 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202].)

Turning to the seizure of defendant's automobile, the record shows a sufficient basis for a belief on the part of the officers that the vehicle was an instrumentality used in the commission of the crime. Aside from the fact that the vehicle, including its license plate, was in plain view of Detective Campbell at the time he was rightfully on the defendant's premises for the purpose of arresting him, the record supports the inference that when Detective Campbell returned to take possession of the vehicle which was in the defendant's driveway, the vehicle was at a point on the premises that was impliedly open to public use. Consequently, the officers who came to the place where the vehicle was and took possession of it were at a place where they had a right to be and where the vehicle was in plain view. (See *Lorenzana* v. *Superior Court,* 9 Cal.3d 626, 632, fn. 3 [108 Cal.Rptr. 585, 511 P.2d 33].)

That the officers were warranted in taking the vehicle into possession is shown by the reasoning of *North* v. *Superior Court,* 8 Cal.3d 301 [104

Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]. In that case North was arrested inside his apartment. Thereafter his car was towed to the police station. As in the case presently before this court, no search warrant was obtained by the officers who seized and examined North's car. In upholding the action of the police in North's case the Supreme Court discussed *People* v. *Teale,* 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564], and stated (8 Cal.3d at p. 308): "We conclude that our decision in *Teale* correctly sets forth the present law regarding warrantless seizures of evidentiary items in plain view of arresting officers, and that the superior court in the instant case properly denied petitioner's motion to suppress evidence derived from the subsequent police examination of petitioner's vehicle."

As to that determination in *North* v. *Superior Court, supra,* Chief Justice Wright separately concurred, stating (8 Cal.3d at pp. 312-313): "I concur with the majority to the extent that they hold that the arresting officer properly seized the vehicle which had been used by petitioner as an instrumentality of the alleged crime. There can be no question that the vehicle is itself evidence of the commission of the crime within the meaning of *People* v. *Teale* (1969) 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564]. Although it was parked on a public street and not within petitioner's immediate control at the time of his arrest (see *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]), the officer committed no trespass when he observed it in plain view and seized possession. (See *People* v. *Block* (1971) 6 Cal.3d 239, 243 [103 Cal.Rptr. 281, 499 P.2d 961].) Speculation as to the meanings to be given to the various views expressed in *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022] fails to support a conclusion that a majority of the members of the high court would hold the seizure in the instant case to infringe the Fourth Amendment's prohibition against unreasonable searches and seizures, and certainly I cannot reach that conclusion."

Under the governing law the search of the interior of defendant's vehicle after it had been seized was lawful. In *People* v. *Braun, supra,* 29 Cal.App.3d 949, officers spotted defendants' parked car and thereafter the officers arrested defendants in their respective hotel rooms. The search of the car used by the appellants in the commission of crimes took place at the police station three to four hours after defendants' arrest in the hotel. In determining the validity of that search the court stated (29 Cal.App.3d at pp. 969-970): "As the court emphasized in *People* v. *Webb* (1967) 66 Cal.2d 107, 123-124, footnote 3 [56 Cal.Rptr. 902, 424 P.2d 342,

19 A.L.R.3d 708], when the police lawfully seize a car which is *itself evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures. The same principle was reiterated in *People* v. *Teale* (1969) 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564], and even more recently in *North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305]. [¶] The record at hand demonstrates without doubt that the automobile itself constituted evidence admissible against appellants for the very crimes for which they were arrested. . . . That the vehicle was so considered by the police is also apparent from the record. . . . The fingerprints taken from the car produced conclusive evidence which connected appellants with the offenses charged. [¶] We conclude that since the arrests of appellants were lawful, the car as the evidence of the crimes charged was properly seized and its later examination at the police station did not constitute a search protected by the Fourth Amendment."

The reasoning of *Cardwell* v. *Lewis,* 417 U.S. 583 [41 L.Ed.2d 325, 94 S.Ct. 2464], does not aid defendant. As stated in the plurality opinion[2] (417 U.S. at p. 585 [41 L.Ed.2d at p. 332]): "This case presents the issue of the legality, under the Fourth and Fourteenth Amendments, of a warrantless seizure of an automobile and the examination of its exterior at a police impoundment area after the car had been removed from a public parking lot." The Supreme Court concluded (417 U.S. at p. 585 [41 L.Ed.2d at p. 332]) that "under the circumstances of this case, there was no violation of the protection afforded by the Amendments."

In the course of the plurality opinion in *Cardwell* v. *Lewis,* Justice Blackmun stated (417 U.S. at pp. 588-589 [41 L.Ed.2d at p. 334]): "This case is factually different from prior car search cases decided by this Court. The evidence with which we are concerned is not the product of a 'search' that implicates traditional considerations of the owner's privacy interest. It consisted of paint scrapings from the *exterior* and an observation of the tread of a tire on an operative wheel. The issue, therefore, is whether the examination of an automobile's exterior upon probable cause invades a right to privacy which the interposition of a warrant requirement is meant to protect. This is an issue this Court has

---

[2]In *Cardwell* v. *Lewis, supra,* although unable to agree on an opinion, five members of the court agreed that the grant of federal habeas corpus relief was improper in that case. The Chief Justice and Justices White and Rehnquist joined in the opinion of Justice Blackmun. Justice Powell concurred in the result.

not previously addressed." It was further stated (417 U.S. at p. 591 [41 L.Ed.2d at p. 335]): "In the present case, nothing from the interior of the car and no personal effects, which the Fourth Amendment traditionally has deemed to protect, were searched or seized and introduced in evidence. [Fn. omitted herein.] With the 'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed."[3] The Supreme Court determined that the seizure itself of the car was not unreasonable. (417 U.S. at p. 593 [41 L.Ed.2d at pp. 336-337].)

In *Cardwell* v. *Lewis, supra,* Justice Blackmun further stated (417 U.S. at p. 593 [41 L.Ed.2d at pp. 336-337]): "The present case differs from Coolidge [*Coolidge* v. *New Hampshire,* 403 U.S. 443 (29 L.Ed.2d 564, 91 S.Ct. 2022)] both in the scope of the search [fn. omitted herein] and in the circumstances of the seizure. Since the Coolidge car was parked on the defendant's driveway, the seizure of that automobile required an entry upon private property. Here, as in *Chambers* v. *Maroney,* 399 U.S. 42 (1970), the automobile was seized from a public place where access was not meaningfully restricted. This is, in fact, the ground upon which the *Coolidge* plurality opinion distinguished *Chambers,* 403 U.S., at 463, n. 20." However, footnote 20 is in part II-B of Justice Stewart's plurality opinion in *Coolidge,* as to which part only four justices agreed, and hence, as explained in *People* v. *McKinnon,* 7 Cal.3d 899, at page 911 [103 Cal.Rptr. 897, 500 P.2d 1097], is without force as precedent. With respect to that footnote, it is interesting to note that in the first paragraph of his concurring and dissenting opinion in *Coolidge* (403 U.S. at p. 510 [29 L.Ed.2d at pp. 608-609]) Justice White stated: "I would affirm the judgment. In my view, Coolidge's Pontiac was lawfully seized as evidence of the crime in plain sight and thereafter was lawfully searched under *Cooper* v. *California,* 386 U.S. 58 (1967) I am therefore in substantial disagreement with Parts II-C and II-D of the Court's opinion. Neither do I agree with Part II-B, and I can concur only in the result as to Part III."

In view of what has been stated hereinabove, *Cardwell* v. *Lewis, supra,* 417 U.S. 583, affords no aid to defendant. Since the trial court did not err in denying defendant's motion to suppress evidence made pursuant to

---

[3]It is to be further noted that the first sentence of footnote 8 of the plurality opinion in *Cardwell* v. *Lewis* is as follows (417 U.S. at p. 592 [41 L.Ed.2d at p. 336]): "Again, we are not confronted with any issue as to the propriety of a search of a car's interior." Thus the case is not pertinent with respect to the search of the interior of defendant's car in the case presently before this court.

Penal Code section 1538.5, defendant's conviction must stand. Consequently, no purpose would be served by a discussion of evidence bearing upon the question as to whether defendant gave an effective consent to search.

The judgment (order granting probation) is affirmed.

Allport, J., and Potter, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 20, 1975.