Filed 1/29/21  P. v. Norris CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHARLES FREDERICK NORRIS,<br><br>    Defendant and Appellant. | G058340<br><br>(Super. Ct. No. 18CF0686)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Appellant was convicted by a jury of nine criminal counts related to years of inappropriate sexual behavior, abuse, and molestation of his daughter,[1] beginning when she was about four years old. The information charged two counts of sexual penetration of a minor (Pen. Code,[2] § 288.7, subd. (b)), one count of oral copulation of defendant by a minor (§ 288.7, subd. (b)), one count of oral copulation of a minor by defendant (§ 288.7, subd. (b)), two counts of sexual intercourse with a minor (§ 288.7, subd. (a)), two counts of lewd and lascivious acts (touching breast and touching vagina, respectively) upon a minor under the age of 14 (§ 288, subd. (a)), and one count of possession of child pornography (§ 311.11, subd. (a)). We affirm the conviction in all respects.

## FACTS

At the time the abuse began, appellant and the daughter's mother had split up and appellant was living with his own mother (daughter's paternal grandmother) in Santa Ana. The daughter's mother was also living with her own mother (daughter's maternal grandmother) in Santa Ana. Ever since the daughter could remember, she split her time between her grandmothers, thereby spending about equal time with both of her parents. Her paternal grandfather, Steven, lived in the San Bernardino Mountains.

### *Appellant's Conduct*

It all started with pornography when the daughter was about four or five years old. At the time, appellant spent a lot of his time in his mother's garage and when the daughter was there alone with him, he would have her watch videos of people "naked and having sex" about once or twice per month. This activity continued even after appellant moved out of his mother's house to Running Springs in San Bernardino

---

[1]     Out of respect for her privacy, we refer to her hereinafter as the daughter.
[2]     All further statutory references are to the Penal Code.

County, where he went to work with Steven. He had his own home in Running Springs and the daughter visited him there.

The daughter was about five years old when appellant began asking her to do inappropriate things, such as repeating vulgar phrases like "Fuck me" or posing for photos naked. The photos would be taken at about the same frequency as he had her view the pornographic videos, about once or twice per month. He would have her pose in different outfits and would usually focus the camera on her breasts or vagina. The daughter said she was uncomfortable with posing for the photos, but appellant would get her to do it by offering to take her out to eat or giving her other things she liked.

Before long, the abuse progressed. Appellant began including himself in the photos, having the daughter hold his penis. When she was seven or eight years old, he started touching her vagina, and when she got older, he touched her breasts. When she was around eight, he started inserting his fingers or other objects, like pens or Sharpie markers, into her vagina. The daughter estimated that, between the ages of 7 and 11, appellant put his fingers in her vagina 10 to 15 times.

When she was around the age of eight, appellant began asking her to put her mouth on his penis. When the daughter was nine, her father performed oral sex on her, digitally penetrated her, and "tried to have sex" with her, videotaping himself attempting to enter her. In her trial testimony, the daughter could not recall other instances of sexual intercourse, though she told sheriff's investigators her dad had sexual intercourse with her three to five times. A photograph and video obtained from appellant's iPhone – and shown to the jury – indicated intercourse had occurred more than one time. The locations of the two images looked different, and the daughter was partially clothed in one and completely nude in the other.

Appellant often showed the daughter photos and images of young-looking children engaged in sex acts or posing in different costumes or scenarios. She specifically recalled one instance where appellant showed her an image of two children

3

or teenagers having sex and told her "I want to make you feel like that." He masturbated himself in front of her "many, many, many, many" times over the years and to the point of ejaculation.

When the daughter was 10, her father entered a romantic relationship with another woman and the abuse stopped for a few months until the relationship hit a rough patch. Then it began again.

The daughter never told an adult about the abuse, but she did tell her friends, which led to two separate meetings with social workers. Both times, the daughter denied any sexual abuse by appellant because he had told her she would not be able to see him anymore if anyone knew.

This changed in early 2018, when the daughter was 12 years old. She was sitting on a pull-out bed watching a movie at appellant's Running Springs residence when appellant approached her from behind and tried to grab her breasts. She moved. He grabbed her hoodie, pulled her back, unzipped it, and reached underneath her clothing to grab her breasts. During the same visit, she was awakened by appellant putting his fingers in her vagina.

The daughter confided about this incident to some friends, and one of them told an adult. This led to another visit from social workers, and this time the daughter told them the truth about the abuse. The police were contacted.

*Sheriff's Investigation, Covert Call, and Search of Electronics*

Sergeant Christine Berryman and her partner, Investigator Naomi Hernandez, were dispatched to the daughter's school where they interviewed her.[3] During the interview, Sergeant Berryman said, the daughter told her and Investigator Hernandez appellant had attempted to insert his penis into her vagina "between three and five times." On cross-examination at trial, this issue became cloudier. The Sergeant was

_____

[3]    At the time, Sergeant Berryman was an investigator with the special victims unit in the Orange County Sheriff's Department (OCSD). She was promoted to Sergeant in early 2019.

4

asked whether the daughter had said appellant only had sex with her one time.  Sergeant Berryman said she had but she had also said appellant *had tried* to have sex with her three to five times.

The investigators decided to have the daughter place a "covert call" to appellant.[4]  During the call, Sergeant Berryman would monitor and pass notes to the daughter in order to bring up certain topics.

Because of apparent cell phone issues, the recorded conversation with appellant turned into multiple calls.  On the second call, the daughter expressed concern about "lying to people" about how appellant "used to take pictures" of her, and told appellant she had told someone about it.  Appellant seemed frustrated, but not at all surprised, and told her he would have to call her back because his reception was bad.  Eventually, appellant called the daughter back and the call was again recorded.  Appellant told the daughter he had heard she had spent some time talking with the sheriffs, and she acknowledged they had wanted to question her.  Appellant first made the daughter swear there was no one listening on the call and then stated: ". . . if it gets out what I did like . . . I'll get in a lot of trouble.  Like a lot of trouble.  You understand that right?"  After the daughter acknowledged this, appellant said he did not want to get in trouble.  ". . . I promise you like it's done, like it's completely done, like I have, I got rid of everything."  He claimed he hated himself and was "completely ashamed" of what he had done.  He said "it sucks keeping a secret" and he would not do it anymore.  When the daughter brought up the fingering incident from early 2018, appellant said "Yes" and claimed he was drunk when he did it.  The recordings of the three covert calls were played for the jury.

---

[4]     A covert call, Sergeant Berryman testified, is a call typically placed by an alleged victim to a suspect and monitored and recorded by law enforcement.  The point of a covert call is to "elicit a statement" from the suspect.

The OCSD obtained a search warrant for appellant's home in Running Springs and Sergeant Berryman was present when they executed it. Appellant was surveilled and detained outside the home. An iPhone 6 was taken off his person. Inside the home, an iPhone 4, an iPad, at least two laptops, and several storage devices were seized. These items were noted by Sergeant Berryman and booked into evidence in this case. One of the laptops recovered was a Toshiba laptop found in a closet in the home. A search warrant was also executed on appellant's mother's home in Santa Ana, and some electronics were recovered.

OCSD Investigator Jerry Chase was among the team of investigators who forensically examined the electronics recovered from both locations. No relevant evidence was recovered from the iPad or from any devices recovered from appellant's mother's home. Thumbnail images were recovered from the iPhone 4S. The Toshiba laptop recovered from appellant's home had a user-generated Windows profile with the name Steve Norris on it.[5] On it, Investigator Chase discovered over 700 pictures – some of which depicted the daughter in sexual situations – and at least three pornographic videos. He called Sergeant Berryman to help identify the images and videos he had found and determine whether any of them included the daughter. She was able to confirm they did.

At trial, Sergeant Berryman identified four such photographs which were shown to the jury. One of the photographs depicted the daughter with a penis in her mouth. Two others showed her partially clothed, exposing her genital area. Another showed her lying completely nude on her back on a bed with white sheets with an adult penis at the entrance of her vagina. In these photos, Sergeant Berryman noted the daughter had a unique fold of skin near the top of her vaginal opening. The metadata for the photos and videos showed they had all been taken with an iPhone 4S, although their

_____

[5]    A user-generated profile is used to set up and create a folder structure for the computer, but a user can use any name they like.

6

dates varied. The iPhone 4S that had been backed up to the laptop was connected to appellant's phone number and was named "Chuck's iPhone."

The jury was able to view 19 other color photographs backed up from the iPhone 4S to the laptop; they were entered into evidence as one stapled group of images. The majority of these images were nude or partially nude photos of the daughter. The dates on the photos ranged from May to early August of 2014, when she was around eight years old. One image, dated June 7, 2014, depicts her inserting her own finger into her vagina. Another image from the same date shows her with an adult penis in her mouth.

In addition to the images of the daughter, the group of 19 photographs included a color image of another "young, likely preteen girl" engaged in a sexual act with an adult male. There was no metadata associated with this photo.

The three videos recovered from the Toshiba laptop but taken with the iPhone 4S contained metadata showing they were dated May 20, 2014 and August 27, 2014. The first video, dated May 20, 2014, showed a girl penetrating herself with her finger, and then another person (face not shown) digitally penetrating the girl. A second video dated the same day began with someone penetrating a girl's vagina with a pen. Then a male voice states "Now you do it," and the pen is given to the girl, who proceeds to insert it inside her vagina. The third video showed the tip of a penis going into a vagina. The girl in the video was wearing a dress lifted above her waist. Portions of these three videos were played for the jury.

*Discovery of Missing iPhone 4S Extraction Report and Aftermath*

After Sergeant Berryman's testimony at trial, counsel brought to the court's attention a newly-revealed mistake in the discovery process. During preparations for the examination of Investigator Chase, the prosecutor, Mena Guirguis, and appellant's counsel, Adam Vining, realized Mr. Vining had not been provided with an extraction report taken from the iPhone 4S. This document was supposed to have been copied onto

7

a thumb drive provided to Mr. Vining during discovery, but it was left out, apparently due to a formatting error. Mr. Guirguis suggested, however, that many of the images in the extraction report would be duplicates of photographs already provided to Mr. Vining.

The trial judge asked Mr. Vining what he would like to do about the problem. Mr. Vining requested the extraction report be excluded and he also desired additional time to review it. After a short recess, Mr. Vining indicated he needed the rest of the day to continue to investigate the report and confer with his client. The court dismissed the jury for the day to allow him time to do so. Counsel reconvened with the court in the afternoon, at which time Mr. Vining requested a mistrial and continuance for 60 days because of supposed new information in the extraction report. He requested an ex parte discussion in chambers to elaborate, which the court allowed over Mr. Guirguis' objection.[6]

In chambers, with only the trial judge and court staff present, Mr. Vining said the extraction report from the iPhone 4S listed 12 different user profiles, including one under the name "Matt Norris," appellant's brother. Because none of the photos or videos in the case actually showed appellant's face, defense counsel felt this newly-divulged report was evidence someone else, and not appellant, had perhaps taken the photos and videos found on the iPhone 4S.

Back in open court, Mr. Guirguis argued the information contained in the extraction report was nothing new, as it had been mentioned in Investigator Chase's report. The court decided to continue argument the next morning and ask the jury to return in the afternoon.

The next morning, the trial court stated it did not think the chambers discussion involved privileged or work-product protected information.[7] Therefore, it

---

[6] Mr. Guirguis thought he was entitled to know if Mr. Vining found anything in the report exculpatory, and he felt a 60-day continuance would be "outrageous" and a "miscarriage of justice" for the daughter to have to give testimony twice.

[7] We have not been asked to review this ruling.

wanted Mr. Vining to explain the basis for his motion for mistrial on the record so the People could adequately understand it. Mr. Vining declined. He felt the information revealed his strategy, and thus constituted work product. Faced with the choice between revealing what he believed to be work product in order to justify mistrial and going forward with his objection on the record, he elected the latter. He felt it would be more harmful to appellant to discuss the contents of the conversation in chambers than to go forward. He did not suggest there was any bad faith in the failure to turn over the report, but he felt it potentially violated appellant's due process rights under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

The trial court agreed the error was not the result of bad faith and denied the mistrial. It was, however, willing to give Mr. Vining a continuance for the rest of the week in order to follow up on any leads generated by the report. Mr. Vining wished to exclude the latest stack of photographs Mr. Guirguis was planning to introduce and he also indicated he had asked months prior for all relevant evidence obtained from the electronics seized by the OCSD. Mr. Guirguis emphasized Investigator Chase's report was clear that, out of seven devices searched, only three contained relevant evidence. Those three devices were listed on his report. Thus, Mr. Guirguis suggested, Mr. Vining could have known information was missing from the thumb drive he received. He was willing to exclude a 54-page pack of photographs he had been planning to introduce – the thumbnail images from the iPhone 4S – in order to move the trial along.

Mr. Vining replied that Investigator Chase's report did not list the information he found potentially exculpatory (the name Matt Norris in the listing of user profiles). He did not seek exclusion of any more evidence, but indicated he would cross-examine Investigator Chase about his report. He was agreeable to putting Investigator Chase on the stand that afternoon and then using the following four days to reevaluate the evidence to determine if he would need to do any further examination of the People's witnesses.

9

Four days later, Investigator Chase returned to the stand to be cross-examined by Mr. Vining. Investigator Chase agreed any name could be used for a user-generated profile, and none of the metadata for the images and videos shown to the jury reflected the actual creator of the photo or video. Mr. Vining pointed out the presence of the name Matt Norris in the user profiles listed in Investigator Chase's report. While Investigator Chase confirmed the user profile Matt Norris was listed in his report, he stated the user profile did not associate to any of the photos. The user profile only reflected someone used it to access a website or e-mail. None of the user profiles found on the iPhone 4S associated with photos or videos. On redirect, Investigator Chase clarified the user profile Matt Norris only appeared to have used the phone one time, while there were numerous other entries on the phone for Chuck Norris. Mr. Vining's questioning made clear to the jury he had only received the extraction report in the middle of trial.

Appellant presented no defense. In his closing, Mr. Vining indicated appellant would concede as to counts seven and eight.

During his closing, Mr. Guirguis addressed the potential third-party perpetrator defense. The trial judge gave a late discovery instruction to the jury.

The jury began deliberations on Monday afternoon and had reached a verdict by Tuesday morning. They found the appellant guilty on all nine counts.

## DISCUSSION

Appellant raises eight grounds for reversal, which we group into five basic issue topics for discussion. First, was the jury incorrectly instructed regarding the unanimity analysis required for each count? Second, was there sufficient evidence to sustain a conviction on count six given appellant's conviction on count five? Third, did the prosecutor's closing argument misinform or mislead the jury regarding the burden of proof, or inflame the passion or prejudice of the jury? Fourth, was there prejudicial error by the prosecution or the trial court in handling the issue of the missing extraction report?

10

Fifth, to the extent the trial court committed error in any of the foregoing areas, was appellant cumulatively deprived of due process as a result?  Because we find only one harmless error in connection with the first four questions, we do not address the fifth.

## I.                          Unanimity Instruction

A criminal jury verdict must be unanimous both as to guilt and as to the specific crime of which a defendant is guilty.  (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)  "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all jurors agree the defendant committed.' (*People v. Sutherland* (1993) 17 Cal.App.4th 602, 612)." (*Russo*, *supra*, 25 Cal.4th at p. 1132.)

Thus, "[i]n a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction should be given.  [Citation.]  But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*People v. Jones* (1990) 51 Cal.3d 294, 321-322 (*Jones*).)  ". . . [B]ecause credibility is usually the 'true issue' in these cases, 'the jury either will believe the child's testimony that the consistent, repetitive pattern of acts occurred or disbelieve it.  In either event, a defendant will have his unanimous jury verdict . . . and the prosecution will have proven beyond a reasonable doubt that the defendant committed a specific act, for if the jury believes the defendant committed all the acts it necessarily believes he committed

11

each specific act[.]'" (*Id.* at p. 322, quoting *People v. Moore* (1989) 211 Cal.App.3d 1400, 1414.)

In this case, the jury was given a modified instruction pursuant to CALCRIM No. 3501 for counts one through eight. It read as follows:

"The defendant is charged with Sexual Penetration with a Child 10 Years or Younger in Counts 1 and 2 sometime during the period of November 23, 2012 to November 22, 2016.

"The defendant is charged with Oral Copulation with a Child 10 Years of Younger in Counts 3 and 4 sometime during the period of November 23, 2012 to November 22, 2016.

"The defendant is charged with Sexual Intercourse with a Child 10 Years or Younger in Counts 5 and 6 sometime during the period of November 23, 2012 to November 22, 2016.

"The defendant is charged with Lewd Act upon a Child Under 14 in Counts 7 and 8 sometime during the period of November 23, 2016 to February 27, 2018.

"The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless:

"1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; "OR

"2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

Appellant argues this instruction constituted error because the jury was led to think it needed only to reach unanimity as to each offense, rather than each count. His counsel, Mr. Vining, did not object to this instruction, and the People therefore contend any potential error was forfeited. But since the court is required to give a unanimity

12

instruction sua sponte, the failure to object did not waive the potential error. (See *People v. Madden* (1981) 116 Cal.App.3d 212, 215-216.)

"The unanimity rule has been refined in cases involving sexual molestation of children and repeated identical offenses." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 556.) In *Jones*, the California Supreme Court saw "no constitutional impediment to allowing" a jury to convict a defendant in such a case "of more than one indistinguishable act" if the jury was given a modified unanimity instruction and three prerequisites were satisfied. (*Jones, supra,* 51 Cal.3d at p. 321.) First, the victim must describe the kind of acts committed. Second, there must be sufficient evidence to show the acts were committed enough times to "support each of the counts alleged[.]" Third, there must be evidence describing the time period during which the acts occurred. (See *People v. Matute* (2002) 103 Cal.App.4th 1437, 1445-1446, 1448 (*Matute*), citing *Jones*, *supra*, 51 Cal.3d at p. 316.)

The trial court here gave a modified unanimity instruction for counts one through eight, and the three *Jones* prerequisites were satisfied for those counts. Counts one and two charged at least two instances of sexual penetration of the daughter. The jury heard and saw evidence of at least two incidences of sexual penetration. There was video of one act involving penetration with a pen, and a photo of digital penetration. The daughter also testified that appellant "[s]ometimes" put objects such as pens and Sharpies into her vagina, and "sometimes" used his fingers to penetrate her when she was around eight years old. She said he penetrated her with his fingers more than one time before he moved out of his mother's home in Santa Ana. There was enough evidence to support at least two counts of penetration of daughter between the ages of 7 and 11.

Count three charges oral copulation of defendant. There were two photographs shown to the jury depicting the daughter copulating a penis. In addition, Investigator Chase told the jury he recovered three images of the daughter with a penis in

13

her mouth from the appellant's iPhone. The daughter herself testified appellant had her perform oral sex on him when she was seven or eight, and it occurred more than once.

Count four charges appellant with orally copulating the daughter. The daughter testified she was nine years old when appellant had licked her vagina before he tried to have intercourse with her at his father's house. Additionally, Sergeant Berryman testified the daughter had told a multi-disciplinary team of child abuse investigators that appellant had licked her vagina more than one time.

Counts five and six charge two separate acts of sexual intercourse with the daughter. At trial, the daughter testified to appellant's attempt at intercourse at his father's house when she was nine, but said this was the only time he had tried to have sex with her. However, Sergeant Berryman stated the daughter had told her during their initial interview that appellant had tried to insert his penis into her vagina between three and five times. Also, the photographs and videos taken on appellant's iPhone suggested intercourse occurred on two separate occasions. There was a video dated August 2014, when the daughter was nine, showing a penis going into the vagina of a girl with a dress pulled above her waist, and there was a photograph of the daughter totally nude lying on her back with a penis at the entrance of her vagina.

Appellant was charged in count seven with touching the daughter's vagina when she was under 14 years old, and in count eight he was charged with touching her breast. Both of these counts were supported by evidence of one act, and thus not necessarily subject to a unanimity instruction. This was part of the last experience of molestation prior to appellant's arrest.

Immediately after delivering the modified unanimity instruction, the trial court told the jury: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict form for each one." In view of the evidence and the jury instructions as a whole, we can see no error with the trial court's failure to replace the word "offenses" in CALCRIM No. 3501 with

14

"counts." The jury returned a separate verdict for each count, finding appellant guilty on each. This indicates the jury considered the offenses count by count and found appellant had committed all of the acts charged by the prosecution.

Appellant likens this case to *People v. Smith* (2005) 132 Cal.App.4th 1537 (*Smith*), in which a child molestation victim described three different types of contact occurring in different parts of the defendant's home. (*Id.* at p. 1541.) We do not find the comparison apt.

The defendant in *Smith* was charged with 10 counts of lewd and lascivious conduct with a child under 14 years of age, and each count had an additional allegation of substantial sexual conduct. The prosecution had used the same "generic statutory language" in charging the counts. (*Smith, supra,* 132 Cal.App.4th at p. 1540.) Defense counsel requested a specific acts unanimity instruction, but the trial court refused, giving only a modified unanimity instruction allowing a conviction if the jury unanimously agreed the prosecution had proven defendant had committed all of the acts alleged. (*Id.* at p. 1543.) The verdict returned was mixed – defendant was convicted on count one, a verdict could not be reached on count two, and he was acquitted of the remaining counts. (*Id.* at p. 1540.) The Third District Court of Appeal stated: "As the jury's mixed verdicts confirm, the evidence sufficiently differentiated between different types, locations, and episodes of molestation as to which a jury might (and here did) disagree as to the particular acts constituting the crime defendant is convicted of committing. Consequently, the trial court erred when it failed, in conformity with *Jones*, to give a specific acts unanimity instruction in addition to an instruction allowing a conviction if the jurors unanimously agreed 'the defendant committed all the acts described by the victim.'" (*Id.* at p. 1544, quoting *Jones, supra,* 53 Cal.3d at pp. 321-322.)

The contrasts with this case are stark. Appellant was charged with five separate offenses. The information did not charge each count identically, and with respect to counts three and four, differentiated as between acts of oral copulation of

15

defendant and of the daughter. The trial court gave a modified unanimity instruction compliant with *Jones* – it allowed conviction if the jury agreed on specific acts *or* on all of the acts. And perhaps most striking was the verdict. Appellant was found guilty on all nine counts. It does not seem the jury disagreed as to particular acts appellant committed – they felt he had committed everything of which he was accused. We therefore find no error.

However, appellant correctly takes issue with the trial court's failure to include count nine in the unanimity instruction it gave. Count nine charged appellant with possession of child pornography. At trial, the People supported this count with the image of a preteen girl engaged in a sex act with an adult male recovered from appellant's device. However, there were also numerous sexually explicit images of the daughter taken with appellant's iPhone, with metadata showing they were taken in 2014. She also testified to appellant's having shown her child pornography over the years. There were thus several discrete acts of possession of child pornography described.

As other cases have observed, there is currently a split of authority regarding the standard to be used in adjudging the harm from the failure to give a unanimity instruction. (See *People v. Wolfe* (2003) 114 Cal.App.4th 177, 185-186 [ultimately applying beyond a reasonable doubt standard under *Chapman v. California* (1967) 386 U.S. 18]; *Matute*, *supra*, 103 Cal.App.4th at pp. 1448-1449 [ultimately applying reasonable probability of a more favorable result standard under *People v. Watson* (1956) 46 Cal.2d 818].) As the *Matute* court did, we find the error harmless beyond a reasonable doubt and we also find there was no reasonable probability appellant would have achieved a more favorable result if count nine had been included in the modified unanimity instruction. Mr. Guirguis in his closing statement explained the jury's obligation with respect to count nine was to agree that appellant possessed one of the images and agree on which one it was. Thus, the jury was effectively advised of the

16

unanimity requirement for count nine. We see no reason to conclude they failed to follow that advice.

**II.        Insufficiency of the Evidence (Count Six)**

Appellant also claims there was insufficient evidence to support his conviction on a second count of sexual intercourse because the daughter testified he had only tried to have sex with her one time. We review the record "in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We find there was sufficient credible evidence to allow a reasonable jury to convict appellant of two separate acts of sexual intercourse with the daughter.

At trial, the daughter testified that, when she was nine years old, appellant "tried" to put his penis into her vagina after instructing her to lie on her stomach and watch pornographic videos on an iPad. She claimed she could not see what he was doing because he was behind her. Thus, the act of sexual intercourse described by the daughter occurred from behind.

In contrast, images and videos obtained from devices at appellant's home, and taken using his iPhone 4S, reflected sexual intercourse occurring with the daughter in different contexts than the one to which she testified. One image showed the daughter completely nude lying on her back with a penis at her vaginal entrance. And a video – again, shot using appellant's iPhone – showed a penis going into a vagina on a girl who was at least partially clothed, not nude. The jury could reasonably conclude that appellant had engaged in more than one act of sexual intercourse with the daughter.

17

### III.　　　　　　　Prosecutorial Misconduct

Appellant also contends his defense was marred by several inflammatory or misleading statements made by Mr. Guirguis to the jury in his closing argument. We take up each individually below.

*Statement No. 1 (Disparaging Defense Counsel)*

"The evidence in this case is beyond overwhelming. . . . [¶] . . . this just happens to be one of those cases where there is no issue. You have the testimony of [the daughter]. You have the defendant's own admissions on recorded conversation. And on top of all that, if that wasn't enough, you have pictures and videos of the actual crimes. There is no issue in this case.

"[¶] . . . [¶]

"But in every case, the defense is going to come up with some defense. I've yet to have a case where I get up and give my closing, no matter how great the evidence is, and the attorney says 'That sounds about right' and sits down. They're going to say something. [¶] So I get a chance at the end because the burden is on me to rebut whatever he says. But I can tell you right now anything he comes up with is absolutely going to be unreasonable. And I'm not saying he's going to do this, because I don't know what the defense is at this point. *But I know from experience, typically defense attorneys will oftentimes try to confuse the issue*." (Italics added.)

Mr. Vining immediately objected to this statement as misconduct. The court held a hearing on the issue outside the presence of the jury, and Mr. Vining moved for a mistrial. The judge denied the motion but determined Mr. Guirguis' statement was inappropriate[8] and gave the jury a curative instruction. He also reminded the jurors that what the attorneys said was not evidence.

---

[8]　　　He was right. It was wholly and egregiously inappropriate to disparage the entire defense bar. It reflects badly on both counsel and his office. We don't expect to see such an argument again. Ever.

"'"In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Friend* (2009) 47 Cal.4th 1, 29; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1294.)" (*People v. Salazar* (2016) 63 Cal.4th 214, 254.)

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill* (1998) 17 Cal.4th 800, 832 (*Hill*).) "Although counsel have broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law [citation] or to resort to personal attacks on the integrity of opposing counsel [citation]." (*People v. Bell* (1989) 49 Cal.3d 502, 538 (*Bell*).) In *Bell*, the California Supreme Court considered a statement by a prosecutor very similar to the one above and determined it could be understood in one of two ways. (*Ibid*.) It "could be understood as a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom." (*Ibid*.) Or it could "be understood to suggest that counsel was obligated or permitted to present a defense dishonestly," and to the extent it could be understood in such a way, "the argument was improper." (*Ibid*.)

Mr. Guirguis told the jury Mr. Vining was going to present a dishonest defense, even though he did not know what was going to be said. Such a statement could potentially have prejudiced the jury against appellant because it may have inclined them to simply dismiss anything Mr. Vining said in his closing. The trial court recognized this and interposed a curative instruction whereby the jurors were required to ignore the remark. This, we believe, was sufficient to solve the problem. "It is the general rule that remarks not made in bad faith as to matters not based upon the evidence do not constitute

prejudicial error where the court admonishes the jury to disregard them." (*People v. Mitchell* (1964) 61 Cal.2d 353, 370.)[9]  It could not have come as a surprise to the jury that the prosecutor thought there was no reasonable defense in the case.  But his cavalier dismissal of the role of the defense bar is shockingly amateurish and endangered his case. He is fortunate he had such overwhelming evidence.

*Statement No. 2: Bias and Shifting Burden of Proof*

In his closing, Mr. Vining reminded the jury of his questions to them during voir dire, recalling the prospective jurors looking at him in a confused way when he asked whether they were biased against child molesters.  "But we are all biased against child molesters," he said next.

Mr. Guirguis picked up on this in his rebuttal, stating as follows: "Mr. Vining talked about bias towards child molesters.  There's nothing wrong with that either.  You can be biased towards child molesters, biased towards terrorists, biased towards murderers.  That's just a word right now.  But yeah.  It's proven he's a child molester.  He's proven he violated the law as charged.  Once you're back there deliberating, that presumption of innocence is gone.  You're allowed to use the evidence to convict him, just like you would a murderer or any other heinous criminal."  Mr. Vining did not object.

Even if the failure to timely object waived the issue for review, we do not believe these comments constituted misconduct.  A similar comment was not deemed misconduct in *People v. Goldberg* (1984) 161 Cal.App.3d 170, 189 because the jury was properly instructed pursuant to CALJIC No. 2.90 about the presumption of innocence. Here, also, the jury was properly instructed as to defendant's right to be presumed innocent until proven beyond a reasonable doubt to be guilty.  The trial judge told the

---

[9]     Because we believe the trial court's admonition to the jury cured the problem, we need not consider whether the trial court abused its discretion in denying Mr. Vining's motion for mistrial based on the remark.

20

jury the lawyers' statements were not evidence, and gave an additional instruction requiring them to defer to the trial court's statements on the law where they conflicted with counsel's statements. Mr. Guirguis' statement did not shift the burden of proof.

To the extent Mr. Guirguis implied the jury could be biased toward child molesters, we note Mr. Vining made just such a concession in his closing. Thus, the statement was unlikely to have any particular impact on the jury's view of child molesters. The crimes charged are egregious in nature; the only question was whether appellant committed them.

Appellant attempts to draw similarities to the prejudicial remark made by the prosecutor in *People v. Herring* (1993) 20 Cal.App.4th 1066 (*Herring*), in which the defendant stood accused of assault and attempted rape. There, the prosecutor stated of his adversary: "'My people are victims. His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth.'" (*Id.* at p. 1073.) We hardly think Mr. Guirguis' statement compares. Unlike the prosecutor in *Herring*, he was not implying appellant was guilty of child molestation offenses simply because Mr. Vining was representing him; rather, he was attempting to persuade the jury the evidence had shown appellant to be guilty. This is precisely the purpose of a closing argument. As our Supreme Court has stated, "'[a] prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation] . . . .'" (*Hill*, *supra*, 17 Cal.4th at p. 819, quoting *People v. Williams* (1997) 16 Cal.4th 153, 221.)

*Statement No. 3: Disparaging Defense Counsel/Inflaming Passion or Prejudice of Jury*

Also on rebuttal, Mr. Guirguis said: "And don't buy for a second that that's not his iPhone or his computer. Because all the evidence is to the contrary. Again, another ploy that is often used is 'Hey, let's just admit some of the charges. Some of the lesser charges when she was a little older – let's admit those and hope the jury says we already found him guilty of something.' That is not your job."

At this point, Mr Vining objected and the trial court overruled the objection.

Mr. Guirguis continued: "Your job is not to cut him a break. 'Well, they admitted these two. Let's go with these and cut him a break on the rest.' Your job is to analyze each count individually. Your job is to analyze each count individually."

Appellant contends Mr. Guirguis' characterization of defense strategy as a "ploy" was disparaging of his counsel, Mr. Vining. We understand this argument – especially in light of Mr. Guirguis' earlier reckless insults, but we must ultimately reject it. Mr. Guirguis' statement is actually somewhat similar to the statement made by the prosecutor in *People v. Gionis* (1995) 9 Cal.4th 1196, 1217: "'[Defense counsel]'s just doing his job. His job is to to [*sic*] get him off.'" Our Supreme Court would "not endorse the cited conduct" but did not think it "render[ed] the trial fundamentally unfair" or "amount[ed] to a deceptive or reprehensible method of persuasion." (*Id.* at p. 1218.)

Likewise, we will not endorse Mr. Guirguis' reference to defense strategy as a "ploy." But the gravamen of his statement regarding the jury's duty was not inaccurate. They *were* required to evaluate each count individually, based on the evidence, without giving improper weight to extraneous concerns such as appellant's concessions on any other counts. As it reminded them of said obligation, statement No. 3 did not constitute misconduct.[10]

Because the only instance of misconduct we have found was addressed by the trial court's instruction, we need not consider whether a mistrial should have been granted due to any misconduct.

---

[10] Ironically, this statement further bolsters our conclusion regarding the modified unanimity instruction – Mr. Guirguis reminded the jury again that its analysis was to occur on a *per count* basis. We just wish he had done so with more care.

**IV.      Newly Turned-Over Evidence (iPhone 4S Extraction Report)**

Appellant also seeks to premise a reversal on the late production of the iPhone 4S extraction report.  First, he argues the trial court abused its discretion in failing to grant a continuance to allow him to develop his third-party perpetrator theory based on the user profiles discovered in the extraction report.  Second, he argues the People's failure to timely turn over the extraction report violated his due process rights under *Brady* and his motion for mistrial should have been granted.

**A.      Continuance**

As the People note in their responding brief, the record discloses appellant was indeed granted a continuance of effectively four days in order to pursue the potentially exculpatory information in the extraction report.  The record further reflects Mr. Vining was able to cross-examine Investigator Chase about the report.  Nevertheless, appellant counters that a continuance of a few days was insufficient because a proper investigation of the extraction report, and fulsome defense based thereon, would have required more time.

"'"'The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.  In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction.'" [Citations.]  Entitlement to a midtrial continuance requires the defendant "show he exercised due diligence in preparing for trial." [Citation.]' (*People v. Fudge* (1994) 7 Cal.4th 1075, 1105–1106.)  Denial of a midtrial continuance is subject to an abuse of discretion standard.  (*Id.* at p. 1106.)" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1548.)  In the interests of proceeding expeditiously with criminal

23

trials, continuances "shall be granted only for that period of time shown to be necessary by the evidence considered at the hearing on the motion." (§ 1050, subd. (i).)

We do not believe the trial court abused its discretion here. We observe the missing extraction report could have been discovered by Mr. Vining earlier. This was not a situation in which an unknown piece of evidence was sprung upon the defense mid-trial. The absence of the extraction report could have been discovered through a synthesized review of Investigator Chase's report and the thumb drive provided to the defense. But in any event, evidence the report referred to was withdrawn and the fact remains the defense was given a continuance. In light of the information available to the trial court at the time, we cannot say the length of the continuance constituted an abuse of discretion.

### B. *Brady* Violation

". . . [T]he suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) Evidence is material if there was a reasonable probability of a different result at trial had it not been suppressed. (See *Kyles v. Whitley* (1995) 514 U.S. 419, 434.) "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (*Ibid*.) This is essentially the element of prejudice required to establish a *Brady* violation. (See *People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).) The test for a *Brady* violation has thus been articulated as follows: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" (*Salazar, supra,* 35 Cal.4th at p. 1043, quoting *Strickler v. Greene* (1999) 527 U.S. 263, 281-282.)

24

Surely, the possibility of a third-party perpetrator using the iPhone was favorable to appellant. But the People contend appellant cannot meet the other two elements of the test – suppression and prejudice. As to suppression, the People argue the extraction material was not withheld, but merely provided late. We share appellant's skepticism of this argument. Indeed, we can see no practical difference between suppression of favorable evidence and delaying production of favorable evidence until the middle of trial. Either event deprives the defendant of the ability to timely develop the evidence into a presentable defense.

But the rubber hits the road on the element of prejudice. Appellant received a fair trial despite the late production of the extraction report. Both counsel were able to address the potential third-party perpetrator defense in front of the jury. The jurors knew information from the iPhone 4S had only been discovered to the defense mid-trial. The trial court gave the jury a late disclosure instruction.

Furthermore, we are confident the timely production of the report would not have affected the outcome of the trial. Investigator Chase observed the user profile of Matt Norris had only logged into the device once, whereas the user profile of Chuck Norris had logged in multiple times. The iPhone 4S was called "Chuck's iPhone" and was associated with appellant's phone number. It was appellant's phone. Coupled with the daughter's testimony at trial and appellant's own admissions in the covert call, it seems to us unlikely the jury would have changed its mind because appellant's brother had once logged into and used his phone.

Because we find there was no *Brady* violation in this case, appellant's claim of error by the trial court in failing to grant a mistrial on such basis is moot.

## DISPOSITION

The judgment is affirmed.


                                    BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.