Filed 6/17/25  P. v. Samson CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B323730 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA472710) |
| v. | |
| RONALD WESLEY SAMSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Norman J. Shapiro, Judge.  Affirmed in part, remanded in part with instructions.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A.

Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

––––––––––––––––––––––––

## INTRODUCTION

Ronald Wesley Samson was convicted of the murder of Kenny Combs. Samson asserted at trial that he killed Combs in self-defense. Samson argues the trial court misstated several jury instructions, including those relating to justifiable homicide. He also argues the court erroneously admitted unduly prejudicial evidence of Samson's prior threats and violence against an eyewitness to the murder. Samson further contends he is indigent, and the court violated due process by imposing fines and fees despite his inability to pay.

We directed the trial court to conduct a hearing to determine whether the reporter's transcript from Samson's trial contained any errors and, if so, to correct them. The trial court did so. Although the reporter introduced additional errors in the corrected transcript, we are persuaded under the circumstances that the trial court did not misstate the jury instructions at Samson's trial. We further conclude the court did not abuse its discretion by admitting evidence relating to Samson's prior threats and violence. We remand, however, to have the trial court conduct a hearing on Samson's ability to pay the fines and fees it imposed at sentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Information*

Samson was charged in 2019 with one count of murder (Pen. Code, § 187, subd. (a)) for the death of Combs.[1]  The information further alleged Samson personally used a deadly weapon (a knife) in the commission of the offense (§ 12022, subd. (b)(1)).

B.    *The People's Evidence*

At trial, the prosecution introduced evidence that, on October 31, 2018, Samson stabbed Combs during an altercation in an alley behind Combs's house.  At that time, Samson had been dating their mutual friend, Rasjay Hardy.  Hardy would stay at Combs's house from time to time.  Hardy was an eyewitness to Combs's murder.

1.    *Hardy's Police Interview*

Officers from the Los Angeles Police Department interviewed Hardy in the early morning hours of November 1.  Hardy explained to detectives that her relationship with Samson was "just going kind of south," so she stayed at Combs's house on October 31 for "some space."  That night, Samson showed up at Combs's house "yelling" for Hardy to come outside.  Combs left his house to talk to Samson.  Hardy overheard Combs and Samson arguing, and when she stepped outside to break it up, she saw the two started fighting.  Hardy saw Samson "pull[] [a] knife out."  She stated she did not see where Samson stabbed

---

[1]    Undesignated statutory references are to the Penal Code.

3

Combs but that she saw Combs's blood and Combs drop to the ground.

Despite extensive questioning, Hardy did not provide detectives with Samson's name until the very end of her interview. When asked for Samson's name, Hardy replied, "I don't want to say his name. I'm—I'm already sitting here. . . . [I]n violation of everything, you know what I'm saying? Like, I can never go back to the neighborhood or nothing, like, I ain't going to my family's house ever again." Further into the interview, Hardy stated that Samson "knows where my family's house is," he had "threatened before to, like, set those houses up," and "I don't want him to set my family's house up." She described that Samson "has friend[s]. That whole [expletive] hood is behind him. One night he kicked me in my face. . . . He was kicking me in my face and the whole neighborhood came, we were fighting on the street. And the whole neighborhood came and told me that I needed to shut the [expletive] up. . . . [I]f he goes in, the whole [expletive] neighborhood is behind him." Hardy explained to police, "I just don't want any harm to come to my family." Eventually, police convinced Hardy to disclose Samson's name.

### 2. *Hardy's Trial Testimony*

Hardy was subpoenaed to testify at Samson's trial. Before Hardy testified, Samson sought to exclude her police interview under Evidence Code section 352. Samson argued Hardy's statements about Samson were "character evidence" and "a jury might improperly infer that the defendant has gang ties." Samson admitted Hardy's prior statements were "surely relevant" if Hardy was "unwilling[]" to testify, but he asked the

4

court to "consider how much of it would come in." The court agreed to "tell the jury at the time this evidence is being admitted for a limited purpose," i.e., to assess Hardy's credibility.

On the stand, Hardy denied knowing Samson or Combs and stated she didn't "remember" any of the events of the murder or her subsequent interview with police. Hardy answered "I don't remember" to almost all questions, but her testimony included the following exchange:

Counsel:  Miss Hardy, are you scared?

Witness:  Yes, ma'am.

Counsel:  Are you afraid to be here right now?

Witness:  I don't want to answer that.

Court:    I didn't hear you.

Witness:  Your Honor, I don't want to answer that question, please.

Court:    You have to answer that question. Are you scared being here[?]

Witness:  I don't want. I don't understand the question.

[. . .]

Court:    Do you know what being scared means[?]

Witness:  Yes.

Court:    Are you scared right now?

Witness:  No.

In response to this line of questioning, and over Samson's objection, the prosecutor impeached Hardy with her police interview. Hardy denied telling police she was afraid for her family because Samson had threatened to "set up" their house.

Hardy also stated she did not remember saying that "the whole neighborhood" supported Samson when Samson "kicked [her] in the face" during a fight. The People then played for the jury a video recording of Hardy's police interview identifying Samson as Combs's killer, including Hardy's statements about being afraid of Samson and his influence in the neighborhood. The court did not give, nor did Samson request, any limiting instruction at the time the video was played.

Later, Samson requested a limiting instruction (CALJIC No. 2.09) to address "the potential misuse of what amounts to character evidence that was admitted to show [Hardy's] fear." The court asked defense counsel to "draw a proposed instruction" and counsel agreed, but the record reflects no instruction limiting the use of Hardy's testimony was given to the jury. Instead, the trial court delivered CALJIC No. 2.09 and referred to other evidence in the case.

3. *Additional Prosecution Evidence*

The People introduced surveillance video of the fight between Samson and Combs, which showed Samson holding a knife, Samson making stabbing motions toward Combs as Samson approached him, and Combs then collapsing to the ground. The police detective who obtained the surveillance video admitted it was "hard to say" whether Samson or Combs initiated the fight.

Combs's autopsy showed multiple stab wounds, including defensive wounds on his hands and a fatal thigh wound, which reached his femoral artery and caused him to bleed to death. The autopsy also established Combs was under the influence of

6

methamphetamine when he died.  Samson's DNA was found under Combs's fingernails.

C.    *Samson's Trial Defense*

Samson testified he killed Combs out of self-defense. Samson asserted he and Combs often spent time together at a bus stop by a liquor store, and he had seen Combs carrying a "small gun."

Samson testified that, on the night of the killing, he came to pick up Hardy from Combs's house and was gathering recyclables from the alley.  Combs came into the alley and started "cursing" at Samson with an "unusual," "angry" demeanor. Samson argued with Combs in the alley, and Combs threatened to "pull my gun" and shoot Samson.  Samson testified he pulled a kitchen knife out of his backpack for safety and moved to pick up his bags of recyclables when Combs hit him "[v]ery, very hard" in the head.

Samson testified he fell to the ground, losing hold of his knife.  He stated Combs continued to punch him in the face and ribs "harder and harder" while yelling he was "going to kill" Samson.  Samson found his knife, and believing he "was going to die," he "started swinging the knife."

Samson also testified he never "laid hands on" Hardy, never threatened to "set the neighborhood houses up," and had no gang ties.

D.    *Samson's Conviction and Sentence*

The jury acquitted Samson of first degree murder but convicted him of second degree murder.  The jury found true the special allegation that Samson personally used a deadly weapon.

The trial court sentenced Samson to 16 years to life in prison. As part of Samson's sentence, the trial court ordered Samson to pay $3,588.50 in victim restitution for "primarily funeral and burial expenses." The trial court further imposed a restitution fine of $300 (§ 1202.4), a court operations assessment of $40 (§ 1465.8), and a court facilities assessment of $30 (Gov. Code, § 70373). It imposed and stayed a parole revocation restitution fine for $300 (§ 1202.45). Defense counsel argued that Samson "was indigent[,] continues to be[,] and has no ability to pay," but the court made no findings on Samson's indigency and noted that "an inmate . . . in a similar type situation—who had no funds, apparently, won a lottery amount out of the blue, and the restitution was enforced against the lottery winnings."

Samson timely appealed.

## DISCUSSION

Samson raises three claims of error. First, he contends the jury received incorrect oral instructions on the doctrine of self-defense. Next, Samson argues the trial court erred in admitting unduly prejudicial evidence of Samson's prior violent conduct. Third, Samson contends the court violated due process by imposing a restitution fine without assessing his ability to pay. We conclude the third argument has merit.

A.  *Samson Does Not Establish the Trial Court Incorrectly Instructed the Jury*

Samson argues, citing the reporter's transcript, that the trial court misstated several jury instructions on the law of homicide, including instructions on provocation, justifiable

8

homicide, and self-defense, and that these errors misled the jury and compromised his self-defense argument. Samson's opening brief identified significant errors in the reporter's transcript with CALJIC Nos. 3.31 (intent), 5.10 (justifiable homicide), 5.12 (self-defense), 5.15 (self-defense), 5.16 (justifiable homicide), 5.54 (self-defense), 8.00 (homicide), and 8.42 (provocation). Samson conceded he did not object to any of these instructional errors at trial, and that the written jury instructions provided to the jury did not contain any errors.

The People asserted that "[a]ny alleged misstatements—which may merely be transcription errors—were harmless because the jury received correct written instructions." The People urged affirmance based on the written instructions but suggested that "[t]o the extent the record needs to be settled or errors corrected, this Court can order a limited remand for that purpose."

### 1. *The Record-correction Hearing*

We requested supplemental briefing regarding whether remand for a record-correction hearing was appropriate under rule 8.155 of the California Rules of Court and *People v. Lucas* (1995) 12 Cal.4th 415, 468-470 (*Lucas*).[2] Samson argued a hearing to "settl[e] the record . . . is appropriate and advisable." Samson's letter brief also identified additional errors with the

---

[2]     Rule 8.155(c) of the California Rules of Court provides: "(1) On motion of a party, on stipulation, or on its own motion, the reviewing court may order the correction or certification of any part of the record.  [¶] (2) The reviewing court may order the superior court to settle disputes about omissions or errors in the record."

reporter's transcript, including with CALJIC Nos. 5.17 (manslaughter) and 5.54 (self-defense). This court directed the superior court to hold a hearing to determine the accuracy of the reporter's transcript and, if necessary, to correct the record.

The superior court held the record correction hearing. Samson was represented by his appellate and trial counsel. The People were represented by appellate counsel from the Office of the Attorney General, with the trial deputy district attorney present.

The court reporter testified she reviewed the challenged portions of the reporter's transcript and determined "there were errors in the transcript." She stated she "needed to make corrections to the record to make it match the written jury instructions" because the transcript "did not match what was read by [the trial judge]." The superior court asked, "[W]ere there any omissions by [the trial judge] that you determined, as compared to the written jury instructions, or was it—it was a verbatim reading?" The reporter answered, "Yes." The reporter further testified she "listened to the recording" of the instructions as read by the judge and she "also looked at [her] notes." She explained that the transcription "doesn't come out perfectly as I am writing. I still have to go through and make corrections, spellings, things like that," but "it is possible that when I went to change the file, it didn't take accurately." Samson's counsel asked, "[D]id the court misread the instructions?" The court reporter testified, "I said previously the court did not misread the instructions."

Based on the court reporter's testimony, the superior court found there were transcription errors and ordered the court reporter to correct the transcript. A copy of the corrected

reporter's transcript was transmitted to this court.  We also invited the parties to brief the impact of the superior court's record correction on this appeal, and we address these arguments below.

2.      *Samson Does Not Establish Instructional Error*

Our review of the corrected reporter's transcript confirms the trial court did not err in delivering the jury instructions Samson challenged as incorrect in his opening brief and supplemental brief.  The corrected transcript reflects CALJIC Nos. 3.31, 5.10, 5.12, 5.15, 5.16, 5.54, 8.00, and 8.42 as read to the jury by the trial court judge were consistent with the written jury instructions included in the clerk's transcript.  Further, as Samson concedes, the written jury instructions themselves were correct and contained no errors.  We may affirm on this basis alone under the well-established presumption that jurors are guided by the written instructions.  (See *People v. Jurado* (2006) 38 Cal.4th 72, 123 ["when the jury has received an instruction in both spoken and written forms, and the two versions vary, we assume the jury was guided by the written version"]; accord, *People v. Mills* (2010) 48 Cal.4th 158, 201 (*Mills*) ["Because the jury was given the correctly worded instructions in written form . . . and because on appeal we give precedence to the written instructions, we find no reversible error."]; *People v. Mungia* (2008) 44 Cal.4th 1101, 1132 ["when erroneous oral instructions are supplemented by correct written ones, we assume the jury followed the written instructions"].)

11

a.      *Substantial evidence supports the superior court's order correcting the reporter's transcript*

Samson argues the court reporter's testimony was not credible or reliable, and therefore substantial evidence does not support the correction of the transcript.  (See *People v. Mitchell* (1964) 61 Cal.2d 353, 371 (*Mitchell*) ["The settlement of a transcript as to corrections and augmentations is primarily a question of fact to be resolved by the trial court."]; see also *People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681 [appellate court reviews trial court's factual findings for substantial evidence].)

The court reporter's testimony identifying the errors as transcription errors, based on her review of her notes and the audio recording for each erroneous instruction, is substantial evidence supporting the record-correction order.  (See *Mitchell*, *supra*, 61 Cal.2d at p. 371 [affirming record correction where the court reporters from trial were present at the hearing, "[t]he trial judge requested that the reporters check their notes as to each requested correction and augmentation, and the rulings of the trial court were in accordance with the matters shown by the court reporters' notes"]; accord, *Lucas*, *supra*, 12 Cal.4th at p. 469 [same, where the court reporter was "confident" of transcription errors and explained that reporter's transcription notes frequently contain errors "which usually but not always are corrected when the reporter proofreads the computer transcription"].)  Although Samson contends the court reporter gave "ambiguous" answers when asked whether the trial court misstated the instructions, the court reporter testified at the hearing in response to questions from Samson's counsel that "the court did not misread the instructions."  (See *In re Caden C.*

(2021) 11 Cal.5th 614, 640 [on substantial evidence review of factual findings, appellate court should not reweigh the evidence or resolve evidentiary conflicts]; accord, *People v. Mumin* (2023) 15 Cal.5th 176, 202.)

> b. *Any purported errors in the corrected transcript do not establish the jury was incorrectly instructed*

In his second supplemental brief, Samson argued the transcript contains additional errors requiring reversal. First, Samson argues the corrected transcript still contains the previously identified error with CALJIC No. 5.17 because the court reporter was evidently unable to "make corrections." But Samson's argument ignores the superior court's finding, supported by substantial evidence, that this misstatement was a transcription error and that the trial court correctly instructed the jury as to CALJIC No. 5.17. (We address Samson's argument the court reporter improperly referred to written jury instructions further below.)

Next, Samson contends the corrected transcript contains a new material error in the court's recitation of CALJIC No. 5.55 on self-defense. While the original reporter's transcript correctly quoted CALJIC No. 5.55 ("The right of self defense is not available to a person who seeks a quarrel with an intent to create a real or apparent necessity to exercise self defense"), the corrected transcript states, "The right of self defense is *only* available" to such a person. (Italics added.)

Under these circumstances, where the original reporter's transcript did not contain the error and the written instructions in the record on appeal correctly recite CALJIC No. 5.55, we

13

determine the clerk's transcript and the original reporter's transcript have "greater credence" than the corrected reporter's transcript. (See *People v. Smith* (1983) 33 Cal.3d 596, 599 [when the record is in conflict, the court should determine "which [part], because of its origin and nature or otherwise, is entitled to greater credence . . . depend[ing] upon the circumstances of each particular case"]; accord, *People v. Beltran* (2013) 56 Cal.4th 935, 945, fn. 7 [assuming "a transcription error" caused discrepancy in record where "[t]he reporter's transcript ungrammatically render[ed] the phrase 'knowing the same facts to do an act rashly' as 'knowing the same facts to do *and* act rashly,'" but clerk's transcript did not contain error].) We therefore conclude the trial court did not misstate CALJIC No. 5.55 when it charged the jury.

              c.      *Correction of the record did not violate due process*

Samson also contends the corrected transcript violates his right to a "reliably accurate" appellate record guaranteed by due process. (See *People v. Elliott* (2012) 53 Cal.4th 535, 595 (*Elliott*) [due process and equal protection principles entitle criminal defendant "to an appellate record that is 'sufficient to permit adequate and effective appellate review'"].) According to Samson, the court reporter improperly corrected the reporter's transcript by referencing the written instructions "without actually consulting her notes or the [audio] recording." Samson infers this because the corrected transcript retains the error with CALJIC No. 5.17 and contains a new annotation stating: "I didn't have CALJIC 5.17 to make corrections to the following sentence." Samson also argues the court reporter corrected CALJIC No. 3.31

14

by reference to the pattern instruction, not the instruction contained in the clerk's transcript.

Even assuming Samson is correct about the court reporter's method of correction (which we need not decide), Samson does not explain how these circumstances prevent meaningful appellate review. (See *Elliott, supra*, 53 Cal.4th at p. 595 [defendant has the burden of showing appellate record is inadequate for meaningful review].) Here, we can review Samson's claims of instructional error because the court reporter testified that, when charging the jury, the trial judge read the written jury instructions correctly, and the written jury instructions are included in the record for our review. (See *Mills, supra*, 48 Cal.4th at p. 201 ["'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.'"]; *People v. Davis* (1995) 10 Cal.4th 463, 542 ["It is generally presumed that the jury was guided by the written instructions."].) And Samson does not argue the written instructions contain any errors. Accordingly, we reject Samson's due process argument.

B.      *Trial Court Did Not Abuse Its Discretion by Admitting Hardy's Police Interview*

Samson next argues the trial court abused its discretion under Evidence Code section 352 by admitting the entirety of Hardy's interview with police, including her statements that Samson had threatened her family's home and kicked her in the face, and that the "neighborhood" was behind Samson.

1. *Governing Law and Standard of Review*

Evidence Code section 352 gives the trial court "discretion [to] exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." The trial court has "broad discretion to evaluate whether the probative value of evidence is outweighed by concerns of undue prejudice." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 811 (*Holmes*); accord, *People v. Williams* (2013) 58 Cal.4th 197, 270 (*Williams*).) "'Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*Williams*, at pp. 270-271.)

2. *The Trial Court Did Not Err by Finding Hardy's Statements Were More Probative Than Unduly Prejudicial*

Samson argues Hardy's statements were more prejudicial than probative because they were "highly inflammatory evidence that portrayed Samson as a 'bad' man who had a propensity for violence" and "insinuated he had gang ties." He also argues Hardy's statement that Samson had assaulted her was prejudicial "evidence of an uncharged offense." For the reasons below, we conclude the trial court did not abuse its discretion by determining the probative value of Hardy's statements to the police outweighed the risk of undue prejudice to Samson.

"'"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional

16

bias against defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"'" (*Williams, supra,* 58 Cal.4th at p. 270; accord, *People v. Bolin* (1998) 18 Cal.4th 297, 320.)  "'Evidence is substantially more prejudicial than probative . . . if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome."'" (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.)  Because evidence of uncharged crimes "may be viewed as 'inherently prejudicial' [citation], "'uncharged offenses are admissible only if they have *substantial* probative value.'"" (*People v. Rogers* (2013) 57 Cal.4th 296, 331; accord, *People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

> ### a.    *Hardy's police interview had high probative value*

Samson argues Hardy's police interview had "minimal" probative value.  He claims Hardy's statements that Samson threatened and assaulted her were not probative but cumulative, considering other evidence that Hardy was afraid to identify Samson as the killer or to testify at trial.

Hardy's statements about Samson's prior violence, threats, and influence in the neighborhood were substantially probative regarding her credibility as the sole eyewitness to the murder. (See *Holmes, supra,* 12 Cal.5th at p. 773 ["'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness.'"]; *Williams, supra,* 58 Cal.4th at p. 271 [rejecting defendant's Evidence Code section 352 argument because evidence was "probative in that it would allow the jury to accurately assess the credibility of the prosecution's central witness"].)  This evidence explained why

17

Hardy was reluctant to identify Samson as the killer to police, and why she refused to testify to this effect at trial. (See *People v. Flinner* (2020) 10 Cal.5th 686, 722-723 [no abuse of discretion under section 352 by admitting evidence that witness feared defendant as "an explanation for why [the witness] did not immediately name [defendant]" as the perpetrator and why witness had "fear of testifying"]; *People v. Lopez* (2018) 5 Cal.5th 339, 360 [evidence that defendant broke witness's leg was "probative in that it would explain to the jury why [witness] was afraid to testify against [defendant], allowing the jury to accurately assess [her] credibility and the inconsistencies in her testimony"].)

Samson argues Hardy testified at trial that she was "scared" and that the rest of her police interview showed she was afraid of implicating Samson. Therefore, he contends, the trial court should have redacted Hardy's statements about Samson's threats and violence against her. The trial court was not required to redact Hardy's description of threats and violence from Samson. Although Hardy's reluctance at trial and in the police interview may have demonstrated Hardy was afraid, it did not explain the underlying basis for her fear, which was that Samson had threatened her and her family. (See *People v. Chavez* (2018) 22 Cal.App.5th 663, 704-705 (*Chavez*) [rejecting argument under Evidence Code section 352 that "the court should have 'sanitized' [witness's] testimony by limiting the details of the nature or extent of [defendant's] threat," which was "highly relevant to [witness's] state of mind and credibility"]; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 417 [court did not abuse its discretion under section 352 by admitting witness's prior statement "that witnesses might be

18

killed" and that "'there's more people out there . . . that's [sic] putting more pressure down'" because they explained witnesses' fear of testifying]; cf. *People v. Valdez* (2012) 55 Cal.4th 82, 135 (*Valdez*) ["'An explanation of the basis for the witness's fear is likewise relevant to the jury's assessment of his or her credibility.'"].)

> b. *The interview was not unduly prejudicial compared to its probative value*

As stated, the probative value of Hardy's statements was substantial because they shed light on Hardy's credibility and her eyewitness identification of Samson as the murderer. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1087-1088 [no abuse of discretion under Evidence Code section 352 by admitting death threat from member of defendant's gang toward witness because relevant to witness's credibility and "inconsistent accounts of events"]; *Chavez, supra,* 22 Cal.App.5th at pp. 704-705 [same, where defendant's death threat against witness "was distinctly relevant to show [witness's] state of mind and credibility"].) The court did not abuse its discretion by concluding the probative value of the evidence that Hardy feared testifying because of Samson's prior violence was more probative than the prejudicial effect of her testimony about Samson's prior violence.

And while the evidence that Samson had kicked Hardy in the face and threatened her family was serious and prejudicial, it was not more inflammatory than the evidence that Samson had killed Combs with a knife. (See *People v. Case* (2018) 5 Cal.5th 1, 32 (*Case*) [no abuse of discretion where admission of prior assaults was unlikely to inflame jury because "the evidence of defendant's uncharged acts of violence was far less inflammatory

19

than the evidence of the charged [murder] offenses"]; *People v. Alvarez* (1996) 14 Cal.4th 155, 215, fn. 19 [same, in admitting evidence of defendant's prior fight in murder case to show witness's fear of defendant].)  For this reason, the risk that the jury might have convicted Samson of murder based on speculation that he was in a gang, or because he had assaulted Hardy in the past, was not so unduly prejudicial as to require exclusion of Hardy's statements.  (See *Case*, at p. 32 ["there is little chance that any juror would be moved to convict defendant for a robbery and murders he did not commit in order to punish him for his relatively minor acts of violence against [others]"]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 408 [same, where uncharged acts were "no more inflammatory" than charged offenses].)

> 3. *The Absence of a Limiting Instruction Did Not Violate Samson's Constitutional Rights*

Samson contends that, even if the trial court properly admitted Hardy's statements, the trial court was required to give a limiting instruction, and its failure to do so was federal constitutional error.  He further argues his trial counsel was ineffective by failing to propose a limiting instruction.

Under the circumstances here, the trial court was not required to give a limiting instruction.  Evidence Code section 355 provides, "When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."  The California Supreme Court has "consistently held that where, as here, a defendant fails to request an instruction, a trial court 'generally [has] no duty to

20

instruct on the limited admissibility of evidence.'" (*Valdez, supra,* 55 Cal.4th at p. 139.)

The record reflects that, at the jury instruction conference, Samson's counsel requested a limiting instruction regarding Hardy's police interview, and the court stated it would give one and directed Samson's counsel to propose one. The instruction the court delivered did not include any language about Hardy's testimony. The court had no sua sponte duty to give a limiting instruction where counsel did not press the issue. (See *Case, supra,* 5 Cal.5th at p. 33, fn. 4 ["failure to remind the court to give [a limiting] instruction precludes [defendant] from arguing on appeal that the court erred"]; see also *People v. Freeman* (1994) 8 Cal.4th 450, 495 (*Freeman*) [where "court apparently offered" a limiting instruction but defendant did not request one, "court ha[d] no sua sponte duty" to give the instruction]; accord, *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051; *People v. Braxton* (2004) 34 Cal.4th 798, 813 ["'"If [a] point is not pressed and is forgotten, [a defendant] may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place."'"].)

Samson argues his trial counsel was ineffective by failing to propose a limiting instruction without "a plausible, tactical reason" for doing so. "To establish ineffective assistance of counsel, [a defendant] must show that [his] counsel's performance was deficient and that []he suffered prejudice from the deficient performance. [Citation.] On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'"" (*People v. Caro*

(2019) 7 Cal.5th 463, 488; accord, *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)  "Accordingly, 'except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal.'" (*Sepulveda*, at p. 301.)

In this case, it is possible that Samson's counsel "may well not have desired the court to emphasize the evidence" by way of a limiting instruction.  (*Freeman, supra*, 8 Cal.4th at p. 495; accord, *People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide."].)  Without additional evidence of defense counsel's reasoning or lack thereof, we are unable to conclude on direct appeal that counsel provided ineffective assistance by failing to propose an instruction limiting the use of Hardy's testimony.

Samson also contends the admission of Hardy's statements without a limiting instruction violated his rights to due process and a fair jury trial by lessening the prosecution's burden of proof.  But "[t]he trial court did not err under state law, and [Samson] does not provide any persuasive reason for us to conclude that the application of California's rules of evidence violated his [federal] constitutional rights." (*People v. Prince* (2007) 40 Cal.4th 1179, 1238-1239 [admission of evidence defendant contended was more prejudicial than probative did not violate Fifth and Fourteenth Amendments]; see *People v. Kraft* (2000) 23 Cal.4th 978, 1035 [citing "rule" that "[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights"].)  In any

22

event, the jury was thoroughly instructed by the court and admonished in closing arguments on the prosecution's burden of proof.

C.    *Under the Federal and State Constitutions, the Court Erred By Imposing Fines and Fees Without a Hearing on Samson's Ability To Pay*

Samson also argues the trial court violated his due process rights by imposing a restitution fine under section 1202.4, a stayed parole revocation restitution fine under section 1202.45, and assessments under section 1465.8 and Government Code section 70373 without determining his ability to pay.[3] Samson was homeless at the time of the offense, and defense counsel stated Samson was indigent at the sentencing hearing.

Samson cites *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), holding that due process prohibits imposition of certain fines and fees on an indigent defendant. *Dueñas* involved a homeless and indigent criminal defendant and reversed the trial court's order of assessments under section 1465.8 and

---

[3]    Samson does not challenge the order of $3,588.50 in direct victim restitution. (See *Dueñas, supra,* 42 Cal.App.5th at p. 1169 ["Direct victim restitution . . . is not at issue in this case."]; see also *People v. Belloso* (2019) 42 Cal.App.5th 647, 658, fn. 8, review granted, Mar. 11, 2020, S259755 [noting distinction between "direct victim restitution that reimburses victims for economic losses caused by a defendant's conduct and the restitution fine imposed to punish the defendant"]; *People v. Evans* (2019) 39 Cal.App.5th 771, 777 [declining to extend *Dueñas* to direct victim restitution].) Accordingly, on remand the trial court need not assess Samson's ability to pay the victim restitution order.

Government Code section 70373, and stayed the imposition of a restitution fine under section 1202.4 "unless and until the People prove that Dueñas has the present ability to pay it." (*Dueñas,* at pp. 1172-1173.) The California Supreme Court granted review of this issue in a related case. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted, Nov. 13, 2019, S257844.)

The People contend *Dueñas* was wrongly decided. But until the California Supreme Court issues further guidance, we apply *Dueñas*. (See *Estate of Sapp* (2019) 36 Cal.App.5th 86, 109, fn. 9 ["Absent a compelling reason, the Courts of Appeal are normally loath to overrule prior decisions . . . from the same division."]; *Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1204 [similar].) We therefore remand for a hearing on Samson's ability to pay the fines and fees assessed by the trial court. (See *People v. Belloso* (2019) 42 Cal.App.5th 647, 663, review granted, Mar. 11, 2020, S259755 [remanding pursuant to *Dueñas* where the court did not conduct an ability to pay hearing]; *Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163, 1173 [reversing fines and fees order where court already determined defendant's inability to pay].)

## DISPOSITION

The case is remanded with directions to hold a hearing on Samson's ability to pay the restitution fine, parole revocation restitution fine, court operations assessment, and court facilities assessment. If Samson demonstrates an inability to pay the restitution fine and parole revocation restitution fine, the court is directed to stay execution of the fines. If Samson demonstrates inability to pay the court operations and court facilities

24

assessments, the court is directed to strike them.  The judgment is otherwise affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.

FEUER, J.

25